**691**

**CENTEX CORPORATION, et al., Plaintiffs,**

**v.**

**The UNITED STATES, Defendant.**

**No. 96–494C.**

United States Court of Federal Claims.

July 6, 2001.

Melvin C. Garbow, Washington, D.C., for plaintiffs. Kent A. Yalowitz, Alan S. Rabinowitz, Howard N. Cayne, Robert J. Jones, Thomas R. Dwyer, Andrew T. Karron, Michael A. Johnson, and Ida L. Bostian, of counsel.

Paul G. Freeborne, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, for defendant. With him on the briefs were Stuart E. Schiffer, Acting Assistant Attorney General, and David M. Cohen, Director. Scott D. Austin, Glenn I. Chernigoff, and Jeffery T. Infelise, of counsel.

## OPINION

BRUGGINK, Judge.

This *Winstar*-related[1] case raises the question of whether, when Congress targets tax legislation at one of the Government's contracting partners, there can be a contractual remedy. The case involves difficult questions about the line of demarcation between the power of Congress to pass legislation for the general welfare and the vested rights of the Government's contracting partners. We are persuaded that, in this instance, Congress has crossed that line and injured vested rights in a manner that gives rise to contractual relief.

Pending are plaintiffs' Second Renewed[2] Motion for Summary Judgment on Liability, defendant's Motion to Dismiss and Cross-motion for Summary Judgment, and defendant's Motion to Strike Plaintiffs' "Comparison" of Proposed Findings.[3] Oral argument was held on June 29, 2001.[4] For the reasons set forth below, plaintiffs' Second Renewed Motion is granted in part and denied in part; defendant's Motion to Dismiss is granted in part and denied in part without prejudice; and defendant's Cross-motion for Summary Judgment is denied. Defendant's Motion to Strike is denied.

## BACKGROUND[5]

This case and the other four pending "tax benefit" cases arose out of efforts made during the 1980s by the Federal Savings and Loan Insurance Corporation ("FSLIC") and

---

1. *United States v. Winstar Corp.*, 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996).

2. The court has already considered two rounds of summary judgment briefing. The plaintiffs' original motion was denied without prejudice in order to narrow the issues. During the second round of briefing, the parties cross-moved for summary judgment. Plaintiffs' Renewed Motion for Summary Judgment was granted in part in that we found that a deduction for covered asset losses existed as a matter of law at the time the contract was entered into. *Centex Corp. v. United States*, 48 Fed.Cl. 625, 632–37 (2001). Plaintiffs' Renewed Motion was otherwise denied without prejudice. Defendant's Cross-motion for Summary Judgment was granted in part in that we found (1) that plaintiffs' assistance agreement, within its four corners, did not contain a promise that a deduction for covered asset losses would continue to exist and (2) that, if such a promise had been made, it would have been unauthorized. *Id.* at 629–32. Defendant's Cross-motion was otherwise denied.

3. Plaintiffs' Comparison of Plaintiffs' Supplemental Proposed Findings of Uncontroverted Fact and Defendant's Statement of Genuine Issues, defendant's Motion to Strike Plaintiffs' "Comparison" of Proposed Findings, plaintiffs' Opposition to Defendant's Motion to Strike, and defendant's Reply in Support of Its Motion to Strike Plaintiffs' "Comparison" of Proposed Findings are filed by leave of court.

4. Oral argument in this case was held in conjunction with oral argument in *First Nationwide Bank v. United States*, 49 Fed.Cl. 750 (2001) and *First Heights Bank, FSB v. United States*, No. 96–811C, because the three cases presented several of the same issues.

5. Defendant purports to dispute many of plaintiffs' proposed findings. However, many, if not most, of the disputes alleged by defendant are not genuine. We note these instances as appropriate in this opinion. Consequently, the relevant facts are undisputed, making the issues presented here appropriate for summary judgment.

the Federal Home Loan Bank Board ("FHLBB" or "Bank Board") to avoid some of the costs of liquidating failing savings and loan institutions. These efforts included assisting healthy institutions to acquire failing thrifts. The plaintiffs in the tax benefit cases are institutions that, in 1988, acquired failing thrifts in transactions supervised by the FSLIC and the FHLBB. As part of the acquisitions, the plaintiffs in these cases entered into contracts with the FSLIC and the FHLBB wherein those agencies promised the plaintiffs certain assistance. This assistance included reimbursing the plaintiffs for losses sustained upon the disposal of "covered assets" acquired from the failing thrifts.[6] Under FSLIC-specific provisions[7] of the Internal Revenue Code as that code existed at the time of these transactions, FSLIC's reimbursement of covered asset losses was not included in the plaintiffs' gross income. Furthermore, as we held in *Centex Corp. v. United States,* 48 Fed.Cl. 625, 632–37 (2001), the Internal Revenue Code provided for a tax deduction for covered asset losses even though those losses were reimbursed with tax-free assistance from the FSLIC. The plaintiffs in these five cases claim that Congress's enactment of § 13224 of the Omnibus Budget Reconciliation Act of 1993, Pub.L. 103–66 (1993), (referred to here as the "Guarini legislation"), which eliminated the covered asset loss deduction, constituted a breach of contract for which the Government is liable for money damages.

Throughout the 1980s, the FSLIC and the FHLBB repeatedly explained to Congress that the FSLIC-specific tax provisions of the Internal Revenue Code reduced the costs to the FSLIC and the FHLBB of selling insolvent thrifts. *See Expiring Tax Provisions: Hearing Before the Subcomm. on Taxation and Debt Management of the S. Comm. on Fin.,* 100th Cong., 2d Sess. 15 (1988) (statement of Lawrence J. White); *Carryover of Net Operating Losses and Other Tax Attributes of Corporations: Hearing Before the Subcomm. on Select Revenue Measures of the House Comm. on Ways and Means,* 99th Cong. 173–77 (1985); Letter from FHLBB Members to Senator Garn (Feb. 14, 1986); FHLBB Annual Report 18 (1986).[8] The tax benefits flowing from the FSLIC-specific tax provisions were, in effect, additional assets that the FSLIC and the FHLBB could market when approaching potential acquirers. Furthermore, in and around 1988, tax experts concluded that one of these tax benefits was a deduction for covered asset losses. These experts included (a) the FSLIC and the FHLBB in formal statements; (b) the FHLBB's outside law firms in privileged and non-privileged communications; (c) the technical staff of the Internal Revenue Service ("IRS"); (d) the Treasury Department's Tax Legislative Counsel and the Treasury Department's experts responsible for estimating the costs of tax legislation; (e) tax experts on the FSLIC's and the FHLBB's staffs; (f) tax

---

We have already set forth some of these facts in *Coast–to–Coast Financial Corp. v. United States,* 45 Fed.Cl. 796 (2000), and in *Centex,* 48 Fed.Cl. 625. However, because the pending motions require greater factual detail than these earlier opinions did, we set forth the relevant undisputed facts here in full.

6. In pertinent part, a covered asset was defined, with exceptions not relevant here, by § 1(o) of the assistance agreement in question in this case as "[e]ach asset acquired by the ACQUIRING ASSOCIATION pursuant to the Acquisitions Agreements ... or by foreclosure of a Covered Asset." A covered asset loss was defined as "the amount ... (i) by which the Book Value of a Covered Asset exceeds the Net Proceeds Received by the ACQUIRING ASSOCIATION upon the Liquidation of such Covered Asset, or (ii) of any write-down in Book Value of a Covered Asset approved by the CORPORATION pursuant to § 4."

7. These FSLIC-specific provisions were discussed in detail in our opinion in *Centex,* 48 Fed.Cl. 625.

8. Throughout its statement of genuine issues, defendant disputes plaintiffs' contention that the covered asset loss deduction was generally understood to be a tax benefit under the FSLIC-specific tax provisions. Defendant points out that certain of the statements relied upon by plaintiffs in support of their proposed findings in this regard do not specifically mention a deduction for covered asset losses. Defendant's argument is beside the point. As we have held, the FSLIC-specific provisions put plaintiffs in a position to take advantage of the loss deductions allowed under §§ 165, 166, and 593 of the Internal Revenue Code. *See Centex,* 48 Fed.Cl. at 632–37.

experts within the Congressional Budget Office and the Comptroller General; (g) the staff of Congress's Joint Committee on Taxation; (h) Centex's own tax experts; and (i) tax experts unaffiliated with either party to the transaction.[9] The benefits associated with the FSLIC-specific tax provisions were set to expire at the end of 1988.

In 1988, the FHLBB urged Congress to extend the FSLIC-specific tax provisions beyond their intended sunset of December 31, 1988. *See Expiring Tax Provisions: Hearing Before the Subcomm. on Taxation and Debt Management of the S. Comm. on Finance,* 100th Cong., 2d Sess. 15 (1988) (statement of Lawrence J. White). Donald Susswein, the FHLBB's outside tax counsel, was involved in this effort. In November 1988, Congress enacted the Technical and Miscellaneous Revenue Act of 1988, Pub.L. No. 100–647, 102 Stat. 3342 ("TAMRA"). This legislation extended the sunset of the FSLIC-specific tax provisions to December 31, 1989. However, TAMRA also cut by fifty percent the tax benefits for FSLIC-assisted acquisitions occurring after December 31, 1988. *See Centex,* 48 Fed.Cl. at 633.

In October and November 1988, several FSLIC and FHLBB advisors—including Donald Susswein and Bobby Hughes, the Director of the Financial Division—prepared memoranda describing the tax benefits available to acquirers. These memoranda specifically highlighted the covered asset loss deduction.[10] Furthermore, a written Request for Proposals provided to prospective acquirers, including the plaintiffs in this case, Centex Corp. and CTX Holding Co. (collectively "Centex"), stated, in pertinent part, as follows:

## TAX BENEFITS

10. In general, the Internal Revenue Code of 1986 presently contains three provisions that provide favorable Federal income tax consequences to a taxpayer that acquires a savings and loan institution in an FSLIC-assisted transaction. First, most FSLIC-assisted acquisitions will qualify as a tax-free reorganization under section 368(a)(1)(G) of the Code. Because of this the tax basis of the assets of the acquired institution will carry over to the acquiror and permit the acquiror to recognize a tax loss upon the disposition of an acquired asset which has a tax basis greater than its fair market value. Second section 382 of the Code generally will permit any net operating loss carryover of the acquired institution to be utilized by the acquiring institution to offset post-acquisition taxable income. Third, section 597 of the Code provides that FSLIC assistance payments received by a savings and loan institution are not includible in income and do not require a reduction in the basis of other assets. These consequences often occur under state income tax laws as well.

11. These provisions have the effect of permitting an acquiring institution to realize tax benefits attributable to a particular item even though FSLIC assistance is received with respect to such item. For example, if the acquiror receives coverage for capital losses incurred on the disposition of identified assets of the acquired institution, *the acquiror is entitled to deduct such loss for federal income tax purposes, notwithstanding that it is reimbursed for the loss by the FSLIC,* and that the FSLIC payment is tax free.... (emphasis added).

The tax-free character of the reorganization, the ability to carryover net operating losses, and the opportunity to take the cov-

---

9. In response to this proposed finding defendant states that "[n]either FHLBB, FSLIC, nor the outside counsel of such entities had authority to speak on behalf of the Government on the subject of the allowability of the covered asset loss deduction." This statement is non-responsive to the proposed finding. Plaintiffs do not claim that any of these entities or persons had the authority to bind the Government on tax matters. Defendant has failed to identify a genuine issue.

10. Defendant disputes that these documents were widely circulated. Plaintiffs do not contend that they were. Defendant has not identified a genuine dispute.

ered asset loss deduction were thus all identified by the FSLIC as tax benefits available in a late–1988 FSLIC-assisted acquisition of failing thrifts. The third of these benefits, the covered asset loss deduction, is the tax benefit that is at issue here. As indicated in the Request for Proposals, the covered asset loss deduction allowed acquirers to recognize a tax loss, even where there was no economic loss due to the tax-free assistance received from the FSLIC on covered asset losses. *See Centex,* 48 Fed.Cl. at 632–37.

Centex representatives personally read and relied on the Request for Proposals,[11] and David W. Quinn, Centex's Chief Financial Officer in 1988, especially relied on the fact that Congress had extended the FSLIC-specific provisions of the Internal Revenue Code.[12] In November 1988, Centex's senior management met with FHLBB Chairman M. Danny Wall to discuss Centex's interest in acquiring a thrift.[13]

Toward the end of November 1988, Centex attempted to bid for a thrift called Seguin Savings and requested a private letter ruling in connection with this potential acquisition. Centex learned that Seguin Savings was not available but that the "LAMB" package, which was part of the FSLIC and the FHLBB's Southwest Plan, might be available. This package was composed of substantially all of the assets and liabilities of a group of four insolvent thrifts.

On December 5, 1988, Centex indicated an interest in acquiring the LAMB package. The next day, Centex representatives met with Leo Blaber, President of the Federal Home Loan Bank of Chicago and lead nego-

tiator on the LAMB package. The parties discussed the availability of tax benefits, Centex's ability to utilize them, and the split of tax benefits between Centex and the FSLIC in any potential deal. Centex initially suggested a sharing arrangement whereby it would retain seventy-five percent of the value of the tax benefits and give twenty-five percent to the FSLIC.

After the December 6 meeting, Mr. Blaber forwarded the term sheet and Mr. Quinn's handwritten quantification of the tax benefits to the Director for the Southwest Plan. Mr. Blaber reported that Centex—unlike other potential acquirers—believed that it would be able to "utilize the existing tax benefits," and that Blaber's "major concern" was "whether or not the tax sharing provision [was] satisfactory."

In a document dated December 12, 1988, Centex again quantified for the FSLIC the FSLIC's share of tax benefits, specifically including an estimation of the covered asset loss deductions. This document stated that it was "assumed that these [capital] losses would be realized equally over the ten year agreement period." Throughout the negotiations, both Centex and the FSLIC negotiators included covered asset loss deductions among the four enumerated categories of tax benefits. Several internal Centex and FSLIC documents estimated the value of covered asset loss deduction for each party to the transaction. During the negotiations, Mr. Quinn and his staff estimated the value of covered asset loss deductions for the Centex Board of Directors and for the FSLIC negotiators.[14]

11. Defendant attempts to dispute this proposed finding by pointing out that Centex "sought the advice of two tax counsel" and "sought separate opinions from both firms as to the tax consequences of the Lamb acquisition." Defendant's statement is non-responsive to plaintiffs' proposed finding. Plaintiffs do not claim that they relied solely upon the Request for Proposals. Defendant has failed to identify a genuine issue.

12. In response to this proposed finding, defendant states that it disputes that "Centex representatives relied upon any guarantee that the tax laws would not change." This statement is non-responsive to the proposed finding. Defendant has failed to identify a genuine issue.

13. Responding to this and several other proposed findings, defendant states that it "disputes any inference that any discussion of sharing 'tax benefit items' ... gave rise to a contractual promise concerning the availability of the covered asset loss deduction, or a promise immunizing such a deduction from legislative clarification." This is non-responsive and merely restates the substance of the court's ruling of February 7, 2001.

14. Responding to this proposed finding, defendant states that it "disputes that [the] estimates were accurate." Plaintiffs have not contended that the estimates were accurate. Consequently, defendant has failed to identify a genuine issue of material fact.

On December 15, FHLBB and FSLIC representatives presented Centex a draft assistance agreement. Centex provided the FSLIC with a markup of this draft agreement on December 16.[15] Also on December 16, Mr. Blaber sent a memorandum to the three members of the Bank Board in response to the request of Board Member Lawrence White for "an analysis of the distribution of tax benefits" in the Centex transaction. The memorandum stated that "it appear[ed] that the approximate [tax] benefit of the transaction to the acquirer would be $128 million, and the approximate [tax] benefit to FSLIC would be approximately $61 million." The memorandum attached a hand-written sheet quantifying tax benefits associated with expected covered asset losses. In quantifying the value of the tax benefits to the FSLIC, Mr. Blaber's group "assume[d] that Centex will have enough taxable income to use all the tax benefits that are generated from ... built-in losses." [16]

Bank Board Member White, on December 20, wrote a memorandum regarding the Centex transaction to other Bank Board members. In this memo, Mr. White stated that he was "concerned about the Board's decisions in choosing between assisted acquisitions and liquidations when tax benefits are heavily involved." The memorandum went on to state:

My "horseback" judgment is that a justifiable "modest" shortfall would be no more than one-third; i.e., the FSLIC's cost savings should be equal to at least 67% of the IRS's foregone tax revenues. I offer this not as a "scientific" judgment but as my feel for what seems appropriate.

I realize that the Congress has approved these tax provisions so as to benefit the FSLIC. And they were worth fighting to preserve, because they do allow us to stretch our limited resources farther. But, with the prospect of a Congressional allocation of funds looming more likely, we need to place limits on the effective loss of government revenues.

. . . .

Following these principles, I am reluctant to proceed with the LAMB package on its current terms, as presented by Leo Blaber.... It appears that the IRS will lose $190 million in foregone tax collections, while the FSLIC's aggregate savings would be only $85 million. I believe that the shortfall is too great to justify going forward.

On December 22, Centex held a telephonic board meeting to approve the acquisition of the LAMB package. The board package prepared for this meeting discussed the "significant tax benefits available to the Centex consolidated group from this acquisition." The package also included a spreadsheet quantifying the tax benefits Centex expected to receive, including the estimated value of the covered asset loss deductions. This link between covered assets and the covered asset loss deductions was, from Centex's standpoint, a critical part of the bargain. Centex priced the transaction and constructed its bid higher than it otherwise would have in reliance on the link between the assets the FSLIC offered for sale and their associated tax benefits.[17]

Bank Board Chairman Wall, on December 23, told Centex CEO Larry Hirsch (1) that the Bank Board had decided not to go forward with the transaction, (2) that Board Member White had been one of the members

15. Defendant "disputes any suggestion in this proposed finding that Centex was not given full freedom to propose any, and all changes to the draft assistance agreement, as set forth in defendant's response to proposed finding no. 16."

16. Defendant contends that these quantifications were incorrect "in that they [were] based upon a multitude of assumptions ...." Plaintiffs did not aver that the quantifications were correct, and the accuracy of these quantifications is irrelevant. Consequently, defendant has failed to identify a genuine dispute of material fact.

17. Defendant disputes this proposed finding by pointing out that there was other consideration flowing to Centex besides the covered asset loss deduction and that Centex recognized at the time that the tax laws could change. However, neither of these facts raises a genuine issue regarding plaintiffs' proposed finding, i.e. that Centex viewed the tax benefits (including the covered asset loss deduction) as central to the bargain.

to vote against the deal, and (3) that Mr. Hirsch should call Mr. White.[18] On Christmas Eve 1988, Mr. Hirsch and Mr. Quinn called Board Member White. Mr. White explained that, unless Centex agreed to accept a smaller portion of the tax benefits, the deal would not be approved. Thereafter, Centex repriced its bid so that the FSLIC would receive a greater share of the tax benefits. Mr. White was satisfied with the new share.

On December 29, Mr. White wrote a memorandum informing the other members of the Bank Board that he now endorsed the Centex transaction because it had been renegotiated "so that the FSLIC will receive an additional $25 million (discounted present value) in the transaction." Also dated December 29, a Recommendation Memorandum—prepared by Stuart D. Root, Executive Director of the FSLIC, and Jordan Luke, General Counsel, and sent to the FHLBB—stated that "FSLIC and Centex will share tax benefits generated" and included "Capital Losses on Covered Assets" as one of the tax benefits to be shared. The Bank Board voted to approve Centex's acquisition of the LAMB package on December 29; and Centex, pursuant to four separate acquisition agreements, acquired the four thrifts contained in the LAMB package that day. Also on December 29, the FSLIC and Centex executed an assistance agreement ("Assistance Agreement").

The Assistance Agreement contained several provisions that are relevant to the issues currently before the court. Section 3(a)(1) allowed plaintiffs to "charge as debits" to Special Reserve Account I "amounts equal to ... [t]he amount of Covered Asset Losses." Under § 6(a)(2), upon the submission by Centex of each Quarterly Report required by the contract, the FSLIC was required either (1) "to wire transfer to the [Special Reserve Account I] of the ACQUIRING ASSOCIATION ... in immediately available funds an

amount equal to the net Debit balance" or (2) with certain restrictions not relevant here, "to direct the net Debit balance ... to carry over as an opening balance for the following Quarter and to treat such net Debit balance for yield maintenance purposes as a Covered Asset for the Quarter following the Quarter to which the Quarterly Report relates." Section 9, *Tax Benefits*, of the Assistance Agreement required plaintiffs either to credit Special Reserve Account I or to pay the FSLIC "an amount equal to the sum of the Federal Net Tax Benefits." Covered asset losses were included among the "Tax Benefit Items," defined in § 9(a), to which the FSLIC was entitled a certain share. Section 9(a)(3) defined this tax benefit item:

> Fifty percent (50%) of the amount of any cost, expense or loss (i) which is incurred by the ACQUIRING ASSOCIATION, (ii) for which the CORPORATION has made or is obligated to make assistance payments to the ACQUIRING ASSOCIATION pursuant to § 3(a) of this Agreement that is not includible in gross income by virtue of the provisions of § 597 of the Code (or, with respect to tax liability, any state income tax law), and (iii) which is either deductible on the ACQUIRING ASSOCIATIONS's Federal or state income tax return or reduces the bad debt reserve balance of the ACQUIRING ASSOCIATION ....

The term Federal Net Tax Benefits was defined by § 9(b) as follows:

> [T]he excess, if any, of: (1) the Federal income tax liability for such taxable year ... which would have been incurred ·... if the Tax Benefit Items described in § 9(a) had not been taken into account ... over (2) the Federal income tax liability for such taxable year ... actually incurred ....

Section 18(c) imposed an obligation on plaintiffs' to "maximize any tax benefits arising

---

18. Defendant argues that Mr. Hirsch's statements regarding what Mr. Wall said are inadmissible hearsay. However, we restrict our use of Mr. Hirsch's statements to the limited purposes of showing (1) that Mr. Wall said that the Bank Board had disapproved the deal, (2) that Mr. Wall said that Board Member White had voted against the deal, and (3) that Mr. Wall said that Mr. Hirsch should contact Mr. White. We do not use the statements as evidence (1) that the Bank Board had actually disapproved the deal, (2) that Mr. White had actually voted against the deal, or (3) that Mr. Hirsch was actually obligated to contact Mr. White. Consequently, because the statements are not being utilized to prove the truth of the matters they assert, they are not hearsay. *See* Fed.R.Evid. 801(c).

from the nature or treatment of assistance from the [FSLIC] under this Agreement .…." Section 4(e) provided that, nine and one-half years after the Assistance Agreement went into effect, all remaining covered assets were to be written down to their Fair Market Value.[19] Finally, § 31, *Continuing Cooperation*, provided, in pertinent part, as follows:

> It is the purpose of this Agreement to provide a means by which the depositors of the ACQUIRED ASSOCIATIONS may be protected against losses, the thrift and financing needs of the communities in which the ACQUIRED ASSOCIATIONS' offices are located may be served, the ACQUIRING ASSOCIATION may receive the benefits and assume the risks contracted for, and expense to the CORPORATION may be reduced. The parties therefore agree that they shall in good faith, and with their best efforts, cooperate with one another to carry out the purpose of this Agreement as described in this section.

The Assistance Agreement's execution date of December 29, 1988, was two days before the tax benefits available under the Internal Revenue Code were to be reduced by fifty percent.

As contemplated by the Assistance Agreement and on the same day that the Assistance Agreement was executed, the IRS issued Centex a private letter ruling regarding certain tax consequences of the acquisitions. This letter ruled (1) that each of the four acquisitions "constitute[d] a reorganization within the meaning of Sections 368(a)(1)(G) and 368(a)(3)(D) of the Internal Revenue Code," (2) that no gain or loss "w[ould] be recognized to [the acquirer] upon the receipt of the assets of each S & L in exchange for the assumption by [the acquirer] of the liabilities of any such S & L," (3) that the basis of the "assets received by [the acquirer] w[ould]

be the same as the basis of those assets in the hands of the [acquired thrifts] immediately prior to the transfer[,]" (4) that the acquirer would "succeed to and take into account the items of each S & L acquired by it, as specified in Section 381(c)[,]" (5) that, "[p]ursuant to section 597(a) of the [Internal Revenue] Code, the payments … made by FSLIC pursuant to the terms of the Assistance Agreement w[ould] constitute money or other property received from FSLIC pursuant to Section 406(f) of the National Housing Act, and as such, w[ould] not be included in the gross income of [the acquirer] or any of the S & Ls[,]" (6) that, "[p]ursuant to section 597(b) of the [Internal Revenue] Code, no reduction in the basis of assets of [the acquirer would] be made on account of money or other property received from FSLIC pursuant to section 406(f) of the National Housing Association [sic][,]" and (7) that, "[p]ursuant to section 904(c)(2)(B) of the Reform Act, section 265 [of the Internal Revenue Code] w[ould] not apply [to] deny any deduction by reason of such deduction being allocable to amounts excluded from gross income under section 597 of the [Internal Revenue] Code."

With the Assistance Agreement in place and with the issuance of the private letter ruling, plaintiffs were in position to take advantage of the tax benefits, including the deduction for covered asset losses, available under the Internal Revenue Code. And, pursuant to the Assistance Agreement, these tax benefits would be shared with the FSLIC. Plaintiffs did not believe that their contract risks included a law change targeted at the bargain struck in the Assistance Agreement.[20]

In the years following the transaction, Centex deducted covered asset losses on its federal income tax returns. During those years, the FSLIC and the Federal Deposit

---

19. After Centex had written off these remaining covered assets, the FSLIC would then reimburse it for the difference between Book Value and Fair Market Value.

20. Defendant disputes this proposed finding and characterizes the finding as proposing that "Centex management and advisors did not believe that their contract risks included a law change

…" Plaintiffs do not contend that their contract risks did not include the possibility of any law change but rather contend that their risks did not include the possibility of a *targeted* law change. Furthermore, the deposition testimony relied upon by defendant to dispute this proposed finding concerns a completely different acquisition and assistance agreement. Defendant's response is non-responsive to plaintiffs' proposed finding.

Insurance Corporation ("FDIC") audited Centex to ensure that Centex was sharing whatever tax benefit items Centex had taken advantage of.[21]

Almost from the moment the Centex deal was closed, however, the press began carrying stories criticizing the FHLBB for entering into the late–1988 deals with acquirers like Centex. In January 1989, a hearing regarding the FSLIC assistance programs was held before the House Committee on Banking, Finance and Urban Affairs. Board Member White testified at this hearing regarding the taxability of capital losses: "What we have got are tax benefits stretched over 10 years of the contract.... It is the non-taxability on the capital loss that extends over 10 years." *FSLIC Assistance Programs: Hearing before the House Comm. on Banking, Fin. and Urban Affairs*, 101st Cong. 44 (1989). Several members of Congress criticized the late–1988 deals for having cost the Treasury too much money in foregone tax revenues. *See id.* at 8, 12–13, 50. Following this Congressional criticism, there was more press criticism of the tax benefit deals.

In March 1989, legislation was introduced in Congress to accelerate the sunset of the tax benefits contained in the 1988 FSLIC-assisted deals. On May 22, 1989, the House Committee on Ways and Means reported out the revenue provisions of the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA"). As reported out by the committee, FIRREA contained a prospective repeal of "the special tax rules applicable to financially troubled financial institutions." H.R.Rep. No. 101–54, at 25 (1989). The committee report stated that "[t]he committee believes that the tax subsidy provided to financially troubled financial institutions through more favorable tax rules than those

applicable to other taxpayers is an inefficient way to provide assistance to such institutions." *Id.* When Congress enacted FIRREA, Pub.L. 101–73, 103 Stat. 183, in August 1989, the repeal of the FSLIC tax benefit provisions (i.e., §§ 368(a)(3)(D), 382($l$)(5)(F), and 597 of the Internal Revenue Code) was made effective on the date of the Ways and Means Committee Report. However, this repeal was effective only with respect to transactions completed on or after May 10, 1989. It had no impact, therefore, on the tax benefit aspects of the Centex transaction.

In the spring of 1989, the FSLIC formed a special Task Force in response to "concern as to whether the provisions of the various agreements provide adequate incentives for acquirers to maximize the value of the assets of the association and to minimize the costs to the FSLIC." Mem. from John Henry to Jimmy Satterfield, *et al.* at 1 (June 24, 1989).[22] This Task Force was charged with "reviewing the various [tax benefit] agreements and making recommendations with respect to whether and how such incentives [i.e., incentives to maximize the value of acquired assets] can be modified to achieve FSLIC's objectives." *Id.* One of the two principal areas of concern considered by the Task Force was the "problem of covered assets." *Id.* at 2. The Task Force proposed a series of recommendations to help solve this problem. One of these recommendations was to "consider approaching the IRS to obtain rulings that are consistent with the FSLIC's desire to reduce inappropriate tax benefits." *Id.* at 15. The Task Force provided an example of such a ruling: "For example, if the IRS determined that, with respect to indemnification payments, an acquirer was, for tax purposes, acting as FSLIC's agent, then the acquirer would not be able to deduct the expenses on losses that FSLIC reimburses." *Id.*

---

**21.** Plaintiffs contend that the FSLIC and the FDIC conducted the audits "to make sure that [plaintiffs were] claiming deductions for covered asset losses." Defendant disputes this contention and states that the audits were conducted to ensure "that whatever tax benefit items Centex had taken advantage of, that those benefits were shared pursuant to the terms of the Assistance Agreement." For our purposes here, we accept defendant's contention as true.

**22.** Defendant states that the billing records relied upon by plaintiffs in partial support of this proposed finding have not been authenticated and do not support the proposed finding. Plaintiffs also relied upon the quoted memorandum, however, and defendant has not disputed the authenticity or veracity of this document. Defendant has not identified a genuine dispute in regard to this proposed finding.

With the passage of FIRREA in August 1989, the FSLIC and the FHLBB were abolished and their functions transferred to the FDIC and three new Government agencies: the Resolution Trust Corporation ("RTC"), the Office of Thrift Supervision ("OTS"), and the Federal Housing Finance Board. FIRREA required the RTC to "review all means by which it [could] reduce costs under existing [FSLIC] agreements" and to "evaluate costs under existing [FSLIC] agreements" with regard to "capital loss coverage," "tax consequences," and "any other relevant cost consideration." 12 U.S.C. § 1441a(b)(10)(B) (1994). The FDIC received FSLIC's assets and liabilities; the FDIC also managed the RTC. Many former employees of the FHLBB were transferred to the new agencies.

In an October 1989 memorandum, Joan Spirtas and Bobby Hughes, both FDIC employees, recommended that the FDIC change its approach to tax benefits in regard to the filing of final receivership returns in connection with FSLIC-assisted transactions. In their memorandum, however, Spirtas and Hughes recognized that "FSLIC policy ha[d] been to maximize tax benefits, even though they were shared with acquirers" and that "[a]cquirers [we]re expecting such treatment to continue." The memorandum went on to state,

> There can be no question that at the time the 1988 transactions were negotiated, FSLIC looked at the potential to receive tax benefits as a means to reduce its cost of assistance. Since the ability to realize the tax benefits of FSLIC assistance is dependent upon the acquirer having taxable income, the acquisitions of problem thrifts by pre-existing corporate entities with demonstrated profits ... almost insured that the full amount of tax benefits (except for [net operating losses]) would be realized. In fact, estimates of the potential for realizing such benefits were calculated in certain instances to determine the net cost of the transaction to the FSLIC. Acquirers understood this

and assumed in negotiations that FSLIC's objectives in this respect was [sic] to maximize these benefits. Therefore, the only matter to be negotiated was the extent to which these benefits would be shared.

Spirtas and Hughes's recommendation to amend the receivership returns in order to reduce the tax benefits associated with the transactions was supported by a memorandum from the law firm of Hopkins & Sutter. The Hopkins & Sutter memorandum provided guidance to the FDIC "as to certain positions to be taken by FSLIC as receiver in preparing final 1988 tax returns for institutions acquired with financial assistance during 1988."

Like the Spirtas and Hughes memorandum, the Hopkins & Sutter memorandum discussed the expectations of the FSLIC and the acquirers at the time of contracting. The Hopkins & Sutter memorandum stated:

> There can be no question that at the time deals were negotiated, FSLIC looked at the potential to receive tax benefits as a reduction in its cost of assistance. Given this view, it would logically seek to maximize such benefits. Acquirers understood this and thus assumed in negotiations that there was a congruence of objectives between them and FSLIC to maximize benefits so that the only matter to be negotiated was the extent to which those benefits would be shared.[23]

Review of the 1988 FSLIC-assisted deals continued in 1990. In June of that year, as part of this review of the deals, the RTC retained Thacher Proffitt & Wood, a law firm in which Donald Susswein was a partner. As noted previously, Mr. Susswein had served as outside counsel to the FHLBB in 1988. In an October 1988 memorandum written by Mr. Susswein to the FHLBB, Mr. Susswein had stated that a deduction for covered asset losses existed under the Internal Revenue Code: "The acquirer receives all FSLIC assistance payments tax-free, and also enjoys the benefit of a ... built-in loss on the

---

23. Defendant objects, on relevance grounds, to all of the proposed findings regarding the recommendation to file amended receivership returns reducing the amount of the tax benefits. The facts we have stated are relevant, however, because they indicate what Government employees, in 1989, believed were the expectations of the parties at the time of contracting.

covered assets."[24] In a July 28, 1989, report prepared for the American Bar Association, Section on Taxation, Mr. Susswein had stated that a "double benefit" to acquirers of failing thrifts had resulted "from the exclusion from gross income of amounts that are essentially intended as compensation for losses while the corresponding tax losses—either net operating losses (NOLs) or built-in losses—are enjoyed without substantial limitation." By August 1990, however, Mr. Susswein had apparently changed his mind. An August 16, 1990, memorandum co-authored by Mr. Susswein stated:

> In reviewing the treatment of covered assets, however, we concluded that there is substantial doubt as to whether a widely held perception of the applicable tax law— as allowing the realization of a tax loss when the holder of a covered asset is fully compensated for any shortfall between the amount received upon disposition and the asset's tax basis—is consistent with the applicable statutory provisions and long-standing IRS published ruling positions.[25]

As a way of removing this "substantial doubt," the Susswein and Buckley memorandum suggested that "Congress or the IRS might wish to review this area and consider clarifying the law." The memorandum concluded by noting that "[w]here the tax benefits from purported losses on covered assets are not expressly shared, acquirers may argue that the anticipated enjoyment of this tax benefit was part of their overall bargain,

and that clarifying or modifying the law in this regard is unfair."

An FDIC memorandum dated August 31, 1990, discussed the possibility of Congressional action regarding the covered asset loss deduction:

> It is generally known that acquirers, as well as the FSLIC, held the opinion that the excess of tax basis over fair market value on Covered Assets ("Covered Asset Losses") was a proper loss deduction on the tax returns of the acquiring association. This opinion was maintained without regard to FSLIC reimbursement. Following such opinions, Covered Asset Losses are widely defined in 1988 Assistance Agreements as Tax Benefit items.
>
> Not withstanding [sic] the above, any unilateral change in the deductibility of Covered Asset Losses must be made by either the Congress or IRS.[26]

In a September 10, 1990, memorandum, Steven Glickstein, an IRS lawyer who had been involved in the 1988 FSLIC-assisted deals, discussed the background of the transactions. The memorandum stated:

> [A]n important tax question to most acquirers was whether they would be permitted to deduct losses on the sale of property covered by a FSLIC loss guarantee. Although the FSLIC and virtually all acquirers were informed that the Service would permit the loss deduction, private letter rulings were not issued on this point because of a procedural technicality.[27]

---

**24.** In regard to this proposed finding, defendant "disputes any inference that Mr. Susswein conducted an independent legal analysis of the deduction in 1988 and 1989" and contends that "the referenced documents demonstrate [that] he was simply reflecting the FHLBB/FSLIC's interpretation of the Internal Revenue Code." As indicated, however, one of the documents relied upon by plaintiffs is a memorandum written by Mr. Susswein to the FHLBB. This memorandum regards "Questions and Answers On New FSLIC Tax Provisions." The document does not in any way indicate that Mr. Susswein was told by the FHLBB what his answers to these tax questions should be, and defendant has pointed to no evidence that this was the case. Defendant has failed to identify a genuine dispute.

**25.** Defendant disputes this proposed finding "to the extent that the finding suggests that Mr. Susswein opined that the IRS position on the

availability of the covered asset loss deduction was clear under the law." Defendant has not, however, disputed the fact that the memorandum contained the words plaintiffs have quoted. Defendant has failed to identify a genuine dispute.

**26.** Defendant disputes this proposed finding and states that plaintiffs failed "to point out that the referenced memorandum stated that, '[t]he FDIC has no control over the deductibility of items in the acquirers' income tax returns."' Plaintiffs did not contend that the FDIC had control over the availability of tax deductions.

**27.** Defendant disputes this proposed finding, stating that the memorandum also contained the following statements: (1) "[i]t is routine policy for the Service not to 'issue' oral rulings. Giving oral confirmation of the rules applicable to the FSLIC transactions was not contrary to this policy. No one who was a party to the discussion

Two days after Mr. Glickstein completed his background memorandum, Mr. Susswein, on behalf of Thacher Proffitt & Wood, sent to the RTC a revised memorandum entitled "Clarifying the Tax Treatment of 'Losses' on Covered Assets." On September 18, 1990, the RTC presented a report ("RTC Report") to Congress, including the revised Thacher Proffitt & Wood memorandum as an appendix. The RTC Report stated that the Government would save money from the "reversal of current tax treatment with respect to the deductibility of built-in losses, where the government has compensated acquirers for their economic losses through capital loss payments." [28]

The Senate Committee on Banking, Housing, and Urban Affairs held a hearing to discuss the RTC Report. The Chairman of the RTC, William Seidman, testified at this hearing. Chairman Seidman discussed the covered asset loss deduction:

> Appendix No. 5 to [the RTC Report] discusses the ability of acquirers to deduct built-in losses when a covered asset is repurchased by FSLIC or the FDIC for an amount equal to the taxpayers' base, and the acquirer is fully and directly compensated with FSLIC capital loss coverage.
>
> If this so-called "double dipping"—that is, deducting a loss and receiving tax-free compensation at the same time—is disallowed, the savings to the Government could be significant.

*RTC Report on FSLIC's 1988–89 Assistance Agreements: Hearing Before the S. Comm. on Banking, Housing, and Urban Affairs*, 101st Cong. 10 (1990). Chairman Seidman took the position that "the Government ought to save every penny they [sic] can." *Id.* at 18.[29] During September 1990, staff attorneys at the Treasury Department were also promoting the RTC proposal.[30]

On October 10, 1990, the FDIC's Legislative Advisor, Scott Baker, sent to Mary Creedon, Associate Director of the FDIC's Division of FSLIC Operations, a memorandum entitled "Information for Senate Appropriations Subcommittee Staff and Congressman Guarini." Representative Frank Guarini was one of the legislators most involved in Congress's review of the 1988 FSLIC transactions. The Baker memorandum stated,

> For Congressman Guarini, we need to provide: . . . [a]ssistance in the form of some kind of briefing or explanation of the double dipping tax issue and the implications of a change in tax treatment. . . . As you will recall, we referred Guarini and staff to Treasury on the double-dipping issue. However, let me know if there is any safe way for us to assist the Congressman on this issue.

On October 22, 1990, Representative Guarini introduced legislation denying deductions for covered asset losses reimbursed at any time after January 1, 1989. H.R. 5886, 101st

---

could reasonably believe they were oral rulings[,]" and (2) "rulings on the deductibility of [covered asset] losses were not issued by the IRS." These statements do not contradict the proposed finding because plaintiffs do not contend that they received oral rulings from the IRS at the time of the transaction.

**28.** Defendant disputes this proposed finding, stating that the RTC report made "clear that a change in the FSLIC/FHLBB's interpretation regarding the availability of the covered asset loss deduction was dependent upon, among other things, 'consultations with the IRS' who had authority to speak on such tax matters." Defendant has not disputed that the RTC Report contained the language quoted by plaintiffs.

**29.** Defendant disputes the proposed finding, stating,
> [The proposed finding] fails to point out that Mr. Seidman expressly stated that "no changes

are made in the terms of the present agreements." . . . Accordingly, defendant disputes any inference that a change in the FSLIC/ FHLBB's interpretation of the deduction represent[s] a breach of the implied duty of good faith and fair dealing or any other duty under the contract.
Whether or not a contract duty has been breached is a legal question, and the statement by Mr. Seidman quoted by defendant is not dispositive of that question. Defendant has failed to identify a genuine issue.

**30.** Defendant disputes this proposed finding, stating that the documents relied upon by plaintiffs "do not represent the view of the Department of the Treasury." Plaintiffs do not contend that the documents reflect the official Treasury position. Defendant has failed to identify a genuine issue.

Cong. (2d Sess.1990). In a statement accompanying his introduction of the bill, Representative Guarini stated:

> This legislation will reduce the overall costs to the Government of financing the S & L bailout . . . .
>
> . . . .
>
> The legislation I am introducing today seeks to implement one of the [RTC Report's] principal recommendations.
>
> My legislation clarifies the tax treatment of the built-in losses of the institutions acquired in the 1988 deals. This proposal does not violate any of the contracts entered into between FSLIC and the acquirers.[31] By ending double-dipping, we will save the Government hundreds of millions, if not billions, of dollars.
>
> . . . .
>
> The parties negotiating these assistance agreements may have assumed the existence of the double dip deduction. Indeed, I have been informed that the acquirers are claiming losses, notwithstanding the reimbursement they are receiving from federal financial assistance. . . .
>
> . . . .
>
> . . . If Congress enacts this legislation, the Government will save billions of dollars that are now needlessly being given away for no legitimate purpose.

136 Cong. Rec. 32601–02 (daily ed. Oct. 22, 1990).

In December 1990, Deputy Assistant Treasury Secretary Michael Graetz authored a memorandum discussing the FSLIC-assisted transactions. This memorandum, in pertinent part, stated:

> The RTC Report recognized the adverse impact that the deduction of covered losses and expenses could have on the cost of the 1988/89 transactions, stating that clarification of this issue is "vital." From the point of view of sound tax policy, as well as sound financial policy, taking into account both costs to the government and appro-
>
> priate economic incentives for assisted institutions, it is unambiguous that losses compensated by the FDIC should be disallowed.
>
> Unfortunately, although the IRS has never taken a published position allowing these losses, it has issued at least one private ruling and conveyed informally both to FSLIC and to potential acquirers that covered losses and expenses would be deductible. Notwithstanding the claim by one of the consultants to the RTC (the law firm Thacher, Proffitt & Wood) that present law is unclear and the suggestion that clarifying legislation be considered, there should be no doubt that denying financial institutions deduction for losses and expenses that are reimbursed by the FDIC will be perceived by many as a repudiation of the government's bargain. . . .
>
> . . . .
>
> D. *Options*
>
> 1. *Legislation clarifying that covered losses and expenses are not deductible*
>
> The Treasury could propose legislation to clarify that losses and expenses reimbursed by the FDIC are not deductible. Senator Roth and Representative Guarini already have proposed legislation that would disallow a deduction for losses and expenses that are reimbursed by the FDIC.
>
> Such legislation would be strongly opposed by the institutions involved in the 1988/89 transactions; they believe that the deduction of covered losses and expenses was part of their bargain with FSLIC. . . .
>
> 2. *Legislation disallowing deduction for covered losses on sale to FDIC and disallowing deduction for covered expenses*
>
> The Treasury could propose legislation that (1) would disallow a deduction for any covered loss on the sale of a covered asset

---

**31.** Plaintiffs did not include this sentence in their proposed finding regarding Representative Guarini's statement. Defendant quoted this sentence in its statement of genuine issues and disputed plaintiffs' proposed finding for failing "to recognize that Congressman Guarini stated that ac-

quirers assumed the risk of a change in the law regarding the deduction." These statements by Representative Guarini constitute legal conclusions that do not dispose of the issues currently before us. Defendant has failed to identify a genuine dispute.

to FDIC and (2) would perhaps disallow a deduction for any covered expense.

This option would allow deductions for reimbursed losses on sales to third parties and, in so doing, provide incentives to institutions to dispose of covered assets promptly. Since it was not contemplated at the time of the 1988/89 deals that the FDIC would exercise its options to purchase covered assets, this approach would reduce somewhat the perception that the government is breaching its agreement.

... To the extent institutions sell covered assets to third parties, this option will allow the institutions to claim deductions for covered losses that they arguably bargained for. Nevertheless, we should expect claims that the government is welshing and cannot be trusted.

We could, of course, simply "support" or "not oppose" such legislation, but this seems to offer little advantage. We would not avoid accusations of welshing on deals but would get no credit for taking the initiative to resolve these issues at minimal costs to the government.

### 3. *Administrative clarification*

We do not believe, with one exception, that denying deductions for covered losses and expenses should, or as a practical matter could, be accomplished administratively. Any attempt to disallow deductions for covered losses and expenses will be litigated and, I believe, with a relatively high prospect of taxpayer success.

In March 1991, the Treasury Department issued its own report ("Treasury Report") to Congress recommending legislation denying a deduction for covered asset losses. In late February and early March 1991, several pieces of legislation denying the deduction were introduced in the Congress by Representative Guarini, Representative Byron Dorgan, and Senator William Roth. On February 27, Representative Guarini introduced his legislation in the House of Representatives. In his remarks, Representative Guarini stated, .

This legislation makes explicit what should already be obvious—that any Federal financial assistance received by these acquirers [from the FSLIC] to compensate them for losses incurred is to be considered compensation for purposes of section 165. The effect of this provision will be to end a practice that RTC Chairman William Seidman has referred to as "obviously double-dipping."

Although this legislation clarifies rather than changes existing law, the effective date of the bill is January 1, 1991. This should obviate any claim on the part of the acquirers that we are retroactively changing the rules of the game....

. . . .

... [M]any acquirers have charged that this legislation violates their contracts with the Federal Government....

Many of the affected parties to the 1988 deals ... rolled the dice. Yet, to avoid even the perception of unfairness, this legislation does not affect any private contractual rights or remedies available to the parties involved.

137 Cong. Rec. E686 (daily ed. Feb. 28, 1991). Representative Dorgan remarked that his legislation would "stop investors of failed savings and loans in the late 1980's from abusing generous tax breaks given to them by the Federal Government." 137 Cong. Rec. E857 (daily ed. Mar. 7, 1991). On the Senate side, Senator Roth commented:

[T]oday I am introducing a bill to restrict the double-dipping now being enjoyed by a privileged few taxpayers as a result of a number of questionable transactions which occurred at the end of 1988 as wealthy investors rushed to the gate to beat the closing of a colossal tax loophole in the code....

. . . .

The necessity for this legislation is clear. Without an unequivocal legislative solution, the IRS will have to challenge and litigate the deductibility of covered losses and expenses, and the uncertainty of years of litigation could continue on....

The critical tax issue raised here is the extent to which financial institutions involved in the "1988 deals" may deduct losses and expenses even though they receive assistance payments from the FDIC

as compensation for those losses or expenses....

137 Cong. Rec. S 2840 (daily ed. March 6, 1991). As these remarks indicate, the proposed legislation eliminating a deduction for covered asset losses was directed at those institutions, like plaintiffs here, who had entered into assistance agreements with the FSLIC.[32]

During the spring of 1991, Bush administration staff held multiple meetings with congressional staff and sent letters to Congress. Staff of the Joint Committee on Taxation sought "deal-by-deal" information from FDIC staff and thanked the RTC for its cooperation. An April 16 letter setting forth the Treasury Department's responses to several questions submitted by Representative Esteban E. Torres through Representative Henry B. Gonzalez, Chairman of the House Committee on Banking, Finance and Urban Affairs stated:

> The RTC has asked the Department of the Treasury to provide clarification on certain tax issues. The Treasury Department, in a March 1991 report, examined whether legislation or other action is appropriate to address the tax issues raised by the RTC Report of September 18, 1990.
>
> The critical tax issue raised by the RTC is the extent to which financial institutions involved in the 1988/89 transactions may deduct losses and expenses even though they receive assistance payments from the FDIC as compensation for those losses of expenses. To the extent that tax deductions are allowed for losses that are compensated by FDIC payments, institutions have a perverse incentive to hold covered assets and to minimize their value when sold. From the point of view of sound tax and financial policy, taking into account both the costs to the government and the appropriate economic incentives for assisted institutions, it is clear that assisted institutions should not be allowed a tax deduction for losses or expenses that are reimbursed by the FDIC. Unfortunately,

as a legal matter, the deductibility of covered losses and expenses under existing law is less clear.

> The Treasury Department has concluded that assisted institutions should not be allowed to deduct losses and expenses that are reimbursed by the FDIC. Some of these institutions will argue that the decision is contrary to their expectations regarding the 1988/89 transactions. Treasury believes, however, that absent a clear congressional directive to the contrary, in order to protect the general taxpayer, it could not sanction the deductibility of covered losses and expenses and the perverse economic incentives that follow from such deductibility.
>
> Certain financial institutions seem likely to challenge Treasury's conclusion, and, as a result, the Treasury Department's decision regarding the deductibility of covered losses and expenses does not settle the issue. The IRS is prepared to challenge and litigate the deductibility of covered losses and expenses. However, the uncertainty of years of litigation can and should be avoided.
>
> Congressional clarification of this issue seems not only desirable but essential....
>
> It is estimated that as much as several billion dollars could be saved if certain deductions are not allowed.

In January 1992, repeal of covered asset loss deductions was included in the President's fiscal year 1993 budget proposals. In the General Explanation of the President's Budget Proposal Affecting Receipts, the Treasury Department stated:

> Allowing tax deductions for losses on covered assets that are compensated for by FSLIC assistance gives thrift institutions a perverse incentive to hold these assets and to minimize their value when sold. The FSLIC, and not the institution, bears the economic burden corresponding to any reduction in value because it is required to reimburse the thrift for the loss. Howev-

---

**32.** Defendant disputes this proposed finding, stating that "the focus was on the deduction and closing what Congress perceived as a loophole in the Tax Code." Even if this is true, the legislation was still targeted at institutions that had entered into assistance agreements with the FSLIC. The only institutions capable of taking the deduction and taking advantage of the so-called loophole were those institutions that had entered into assistance agreements with the FSLIC.

er, the tax benefit to the thrift and its affiliates increases as tax losses are enhanced. The institution, therefore, has an incentive to minimize the value of covered assets in order to maximize its tax loss and the attendant tax savings.

. . . .

[If the covered asset loss deduction is denied,] [a]ssisted thrift institutions will no longer have an incentive to minimize the value of covered assets in order to maximize their tax loss on the sale or write-down of these assets and the attendant tax savings. In addition, clarification of the tax treatment of FSLIC assistance will facilitate measures to renegotiate and reduce the cost of the 1988/89 FSLIC transactions.

*Gen. Explanations of the President's Budget Proposals Affecting Receipts: Dep't of the Treasury*, at 95–96.

On January 22, 1992, Representative Dan Rostenkowski, Chairman of the House Ways and Means Committee, announced that the committee would hold a hearing on various bills relating to the tax treatment of covered asset losses. This hearing was convened on February 11, 1992. Testifying at the hearing in favor of the elimination of the covered asset loss deduction was Terrill A. Hyde, Tax Legislative Counsel for the Treasury Department. Ms. Hyde testified:

[T]he [Treasury Report] acknowledged that the Internal Revenue Service had ruled privately, in one technical advice memorandum and in one closing agreement, that losses on covered assets are deductible, and that, at the time of the 1988 and 1989 transactions, Internal Revenue Service personnel informally told potential acquirers that losses on covered assets were deductible.

However, the [Treasury Report] concluded that acquirers represented by sophisticated counsel are not entitled to rely on unpublished rulings or on informal advice of this nature.

*Tax Aspects of Government–Assisted Savings and Loan Acquisitions: Hearing Before the House Comm. on Ways and Means,* 102d Cong. 38 (1992). Responding to questioning from Representative Bill Archer, Ms. Hyde stated, "Our legislation is very narrowly drafted to reach only the transactions in which we believe these perverse incentives exist." *Id.* at 69.

Three representatives of the RTC also appeared in support of the legislation to eliminate the covered asset loss deduction: William H. Roelle, the RTC's Chief Financial Officer; Joan Spirtas, Chief of the RTC's Tax and Accounting Policy Section; and Louis Wright, Vice President for FSLIC Resolution Fund Restructuring. Mr. Roelle testified,

People from FSLIC say . . . that the tax benefits were certainly pointed out as an inducement for the acquisition. So it is clear to us that it was certainly there, it was part of the transaction.

. . . .

. . . I think the tax benefits were a pure incentive for these transactions. But I also believe that the FSLIC was put in a position to—of trying to resolve something without the true ability to engage in a real resolution.

. . . .

. . . I suppose that if I had to come down on one side of this, I think that those deals were excessive in terms of the value to the acquirer.

*Id.* at 103–05.

In February 1992, the House Ways and Means Committee reported out Representative Guarini's legislation eliminating the deduction for covered asset losses. The Committee Reports specifically mentioned the 1988 FSLIC-assisted transactions and pointed to the RTC Report and the Treasury Report for support for their conclusions.[33] ·

---

**33.** Defendant disputes this proposed finding, stating that "Congress undertook an independent analysis of the availability of the deduction as a matter of law and the 'perverse economic' incentive inherent in the deduction and enacted clarifying legislation." Defendant's purported dispute is non-responsive. Plaintiffs do not contend that Congress did not undertake an independent analysis, and the Committee Report expressly referred to both the RTC Report and the Treasury Report.

Congress passed the Guarini legislation as § 13224 of the Omnibus Budget Reconciliation Act of 1993, which became law when the President signed it on August 10, 1993. Section 13224, in pertinent part, provided:

(a) General Rule.—For purposes of chapter 1 of the Internal Revenue Code of 1986—

(1) any FSLIC assistance with respect to any loss of principal, capital, or similar amount upon the disposition of any asset shall be taken into account as compensation for such loss for purposes of section 165 of such Code, and

(2) any FSLIC assistance with respect to any debt shall be taken into account for purposes of section 166, 585, or 593 of such Code in determining whether such debt is worthless (or the extent to which such debt is worthless) and in determining the amount of any addition to a reserve for bad debts arising from the worthlessness or partial worthlessness of such debts.

(b) FSLIC Assistance.—For purposes of this section, the term "FSLIC assistance" means any assistance (or right to assistance) with respect to a domestic building and loan association (as defined in section 7701(a)(19) of such Code without regard to subparagraph (C) thereof) under section 406(f) of the National Housing Act or section 21A of the Federal Home Loan Bank Board Act (or under any similar provision of law).

(c) Effective Date.—

(1) In General.—Except as otherwise provided in this subsection—

(A) The provisions of this section shall apply to taxable years ending on or after March 4, 1991, but only with respect to FSLIC assistance not credited before March 4, 1991.

. . . .

Omnibus Budget Reconciliation Act of 1993, Pub.L. 103–66, § 13224 (1993).

The impact of the Guarini legislation was limited to those institutions, like plaintiffs here, who had contracted for assistance from the FSLIC as part of their acquisition of failing thrifts. The legislation retroactively eliminated the deduction for covered asset losses that had been available under §§ 165, 166, 585, and 593 of the Internal Revenue Code; the legislation did not eliminate the deduction, previously available under those same sections, for any other kind of loss.

## DISCUSSION

### I. Breach of Express Contract [34]

There can be no meaningful debate about what occurred. The parties to the Assistance Agreement understood that the "double dip" was available and that this special tax incentive, along with others, was what made the agreement desirable to plaintiffs. Government negotiators understood that motivation and specifically constructed the Assistance Agreement to take advantage of those benefits for the United States. These negotiators were more than willing to market the "perverse incentives" Congress had made available when they were eager to have plaintiffs take over responsibility for failing thrifts. However, having, at the very least, delayed its liability to the depositors of the problem thrifts, the United States almost immediately sought,[35] using its unique sover-

---

**34.** We need not discuss defendant's motion for summary judgment on contract liability because defendant's only argument in support of its motion is that the Assistance Agreement contained no promise that a deduction for covered asset losses would continue to exist. We have already agreed with defendant in this regard. *See Centex,* 48 Fed.Cl. at 629–32. Furthermore, because we agree with plaintiffs that defendant breached the implied covenant of good faith and fair dealing, we need not discuss plaintiffs' breach argument based on *Wood v. Lovett,* 313 U.S. 362, 61 S.Ct. 983, 85 L.Ed. 1404 (1941), or plaintiffs'

breach argument based on the Assistance Agreement's cooperation clause.

**35.** We do not rely on the agencies' lobbying efforts and changes of position in our determination that there has been a breach of the implied covenant of good faith and fair dealing. Consequently, we need not address defendant's argument that plaintiffs' claims regarding these activities are precluded by the termination agreement discussed in our February 7, 2001, ruling. We do, however, note these facts as background in-

eign powers, to deprive plaintiffs of the tax benefits previously negotiated. In enacting targeted, retroactive legislation that deprived plaintiffs of the very benefits for which they had contracted, the United States breached the contract's implied covenant of good faith and fair dealing.

All contracts, including government contracts, contain an implied covenant of good faith and fair dealing. *See Landmark Land Co., Inc. v. United States*, 46 Fed.Cl. 261, 269 (2000) ("All parties to a contract have an obligation to act in good faith, regardless of whether the contract states it."); *Allstates Air Cargo, Inc. v. United States*, 42 Fed.Cl. 118, 124 (1998); *Ebasco Servs., Inc. v. United States*, 37 Fed.Cl. 370, 382 (1997) ("Every government contract contains an implied covenant of good faith and fair dealing."); Restatement (Second) of Contracts § 205 (1981); *cf. Essex Electro Eng'rs, Inc. v. Danzig*, 224 F.3d 1283, 1291 (Fed.Cir.2000) (discussing one aspect of the duty of good faith and fair dealing). In a government contract, the implied covenant of good faith and fair dealing requires that the Government not use its unique position as sovereign to target the legitimate expectations of its contracting partners. *Cf. Yankee Atomic Elec. Co. v. United States*, 112 F.3d 1569, 1575 (Fed.Cir.1997) (emphasis added) ("The Government-as-contractor cannot exercise the power of its twin, the Government-as-sovereign, for the purpose of altering, modifying, *obstructing* or violating the particular contracts into which it had entered with private parties."). If the covenant did not impose this limitation upon the Government, every contract promise made by the Government would be illusory.[36] *See Hughes Com-*

*munications Galaxy, Inc. v. United States*, 26 Cl.Ct. 123, 140 (1992) (discussing good faith limitations on the sovereign acts defense), *rev'd on other grounds*, 998 F.2d 953 (Fed.Cir.1993).

When the parties to the contract here agreed to a fifty-fifty split of the benefits derived from the covered asset loss deduction, that ratio, as a matter of contract, was fixed.[37] It is indisputable that neither party was then at liberty to alter the ratio unilaterally without becoming liable for damages. Here, however, the essence of defendant's argument is that it cannot be held liable in contract for targeting and retroactively eliminating plaintiffs' opportunity to utilize those tax benefits because (1) the Guarini legislation did not technically alter the ratio prescribed by the contract and (2) the Government made no express promise that a deduction for covered asset losses would continue to exist. We reject defendant's argument.

The contract contained terms requiring the FSLIC to reimburse plaintiffs for covered asset losses, requiring plaintiffs to maximize any tax benefits, and requiring plaintiffs to share with the FSLIC any tax benefits derived from the deduction of covered asset losses. These substantive obligations created a contractual superstructure that rested on the parties' mutual assumption of a deduction for covered asset losses. *See Alaska v. United States*, 35 Fed.Cl. 685, 704 (1996), *aff'd*, 119 F.3d 16 (Fed.Cir.1997). It would be inconceivable that there was not, implicit in the Government's agreement to accept only fifty percent of the benefits derived from the

---

formation leading up to Congress's enactment of the Guarini legislation.

**36.** Defendant argues that we have already rejected plaintiffs' "illusory contract" argument. Def.'s Mot. to Dismiss, Cross–Mot. for Summ. J., and Opp'n to Pls.' Second Renewed Mot. for Summ. J. at 25. Defendant is mistaken. In our earlier ruling, we merely held that the mechanism whereby tax benefits were shared was not rendered meaningless even in the absence of a promise that the deduction for covered asset losses would continue to exist. *See Centex*, 48 Fed.Cl. at 630. We did not address the question of whether the contract was illusory in the absence of an implied promise that the Government

would not target the legitimate expectations of its contracting partner.

**37.** " 'In contracts involving the government, as with all contractual relationships, rights vest and contract terms become binding when, after arms length negotiation, all parties to the contract agree to exchange real obligations for real benefits.' " *Winstar Corp. v. United States*, 64 F.3d 1531, 1546 (Fed.Cir.1995) (quoting *Winstar Corp. v. United States*, 25 Cl.Ct. 541, 545 (1992)), *aff'd sub nom. United States v. Winstar Corp.*, 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996).

covered asset loss deduction, the good faith promise that the Government would not exercise its taxing power, in a way targeted at this particular contract and ones similar to it, to eliminate the means by which the benefits were generated and thereby divert to itself one hundred percent of the benefits.

Absent the implied good faith obligation not to target the deduction for elimination and, thereby, target one of the benefits plaintiffs received because of the contract, the contract's terms no longer hold together.[38] The extensive negotiations concerning the allocation of tax benefits would have led to a useless, unenforceable agreement. *See Perry v. United States*, 294 U.S. 330, 352 n. 2, 55 S.Ct. 432, 79 L.Ed. 912 (1935) (quoting 3 Hamilton's Works, 518, 519) (" 'It is in theory impossible to reconcile the idea of a promise which obliges, with the power to make a law which can vary the effect of it.' "). Furthermore, if the Government had entered into such negotiations with the unexpressed view that, in its unfettered discretion, it could invoke its "sovereign" legislative powers to target and eliminate the benefit, it would have been tantamount to fraud. Consequently, even though Congress did not breach any express provision of the contract, passage of the Guarini legislation constituted a breach of the implied good faith promise that attached to the contract's express provisions.[39]

Defendant contends that no breach of the implied covenant of good faith could have occurred here because the benefits were derived from a tax deduction and plaintiffs understood that the tax laws could change. This argument does not provide defendant an escape from contractual liability. Plaintiffs acknowledge that, if Congress had enacted a public and general change in the tax law, they would have no claim for contract damages. An example of such a public and general change would be if Congress had repealed §§ 165, 166, and 593 of the Internal Revenue Code. This repeal would have had the effect of eliminating loss deductions for every taxpayer who previously had been able to take loss deductions under those sections. The group of impacted taxpayers would have included both those with and those without government contracts. The impact of the Guarini legislation, however, was quite different from that of our hypothetical. The uncontroverted evidence here demonstrates that the Guarini legislation was specifically intended to strip those taxpayers who had entered into contracts with the FSLIC and the FHLBB of the fruits of those contracts.

In the 1980s, Congress had adopted legislation enabling regulators to attract healthy corporations to assist in the bailout of the FSLIC. Tax benefits were essential to the success of this plan, and the assistance agreements were built around those benefits. It is remarkable, therefore, that the ink was barely dry on the agreements before Con-

---

38. We reject defendant's argument that, because there was no express promise of a continuing deduction for covered asset losses, the benefits derived from the covered asset loss deduction did not constitute a fruit of the contract. In the contract itself, the parties identified covered asset losses as a Tax Benefit Item. It is clear, therefore, that the parties viewed the monies to be derived from the covered asset loss deduction as constituting a benefit flowing from the contract. This conclusion is further supported by the fact of the Government's marketing of the covered asset loss deduction in the Request for Proposals and the fact of plaintiffs' reliance on that document. That the benefit was a "tax" benefit does not alter this analysis. As we discuss below, the classification of the Guarini legislation as tax legislation does not shelter defendant from contractual liability.

39. This explains why defendant's reliance on our statement that "[i]f no promise is found, the plaintiff's claim fails[,]" *Coast–to–Coast Fin. Corp. v. United States*, 45 Fed.Cl. 796, 803 (2000), is misplaced. Under their implied covenant theory, plaintiffs do not allege that an express promise of a continuing covered asset loss deduction was breached. Rather, they allege that the implied covenant of good faith and fair dealing was breached. Consequently, plaintiffs have identified a promise, i.e. the implied covenant of good faith and fair dealing, that was contained in the contract from the moment of execution. To acknowledge the presence of this implied covenant in the contract is not to create a new obligation. Because the implied covenant is an independent obligation, although admittedly limited in scope, "[a] party may be in breach of its implied duty of good faith and fair dealing even if it is not in breach of its express contractual obligations." *Chase Manhattan Bank, N.A. v. Keystone Distribs., Inc.*, 873 F.Supp. 808, 815 (S.D.N.Y.1994) (citation omitted).

gress announced its surprise that Centex and others were profiting from the tax aspects of the deals. Of course Centex was in a position to make money from the transaction. If it had not been, the FSLIC would not have been able to induce Centex to take on responsibility for honoring depositors' demands.[40]

The instant case is unlike *United States v. Carlton*, 512 U.S. 26, 114 S.Ct. 2018, 129 L.Ed.2d 22 (1994). In that case, the plaintiff taxpayer, who was not one of the Government's contracting partners, contended that the retroactive application of an amendment that limited the availability of a recently added tax deduction violated the Due Process Clause of the Fifth Amendment. The Court concluded that the retroactive application of the amendment satisfied the requirements of due process. This conclusion rested, in part, on the Court's finding that there was "no plausible contention that Congress acted with an improper motive, as by targeting estate representatives such as Carlton after deliberately inducing them to engage in [employee stock-ownership plan]˙transactions." *Carlton*, 512 U.S. at 32, 114 S.Ct. 2018. Here, there is such a "plausible contention," and that contention is amply supported by the uncontroverted facts.[41]

Contrary to defendant's fears, our finding of targeting does not render the legislation "invalid." Def.'s Mot. to Dismiss, Cross–Mot. for Summ. J., and Opp'n to Pls.' Second Renewed Mot. for Summ. J. on Liability at 34. The Government can still close so-called tax loopholes just as it did in the legislation at issue in *Carlton*. The difference̦ between *Carlton* and this case is that the plaintiff in *Carlton* did not have a contract with the Government that was linked to tax benefits. In any event, the question of validity is not before us, nor would we have jurisdiction over that question.

This case also is not analogous to the hypothetical tax rebate case contemplated by the plurality opinion in *United States v.*

*Winstar Corp.*, 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996). In discussing the application of the unmistakability doctrine, the plurality stated:

> The application of the doctrine will therefore differ according to the different kinds of obligation the Government may assume and the consequences of enforcing them. At one end of the wide spectrum are claims for enforcement of contractual obligations that could not be recognized without effectively limiting sovereign authority, such as a claim for rebate under an agreement for a tax exemption.

*Winstar*, 518 U.S. at 880, 116 S.Ct. 2432. Defendant argues that, in this statement, the *Winstar* plurality "recognized that the area of taxation implicates a sovereign power in its most basic form" and that this recognition forecloses a finding of targeting here. Def.'s Mot. to Dismiss, Cross–Mot. for Summ. J., and Opp'n to Pls.' Second Renewed Mot. for Summ. J. on Liability at 34. The *Winstar* plurality, however, did not state that tax legislation could never be targeted or that it could never constitute a breach of contract. Accepting this view of the plurality's statement would be fundamentally at odds with its discussion of the sovereign acts doctrine. In discussing the sovereign acts doctrine, the plurality stated:

> If the Government is to be treated like other contractors, some line has to be drawn in situations like the one before us between regulatory legislation that is relatively free of Government self-interest and therefore cognizable for the purpose of a legal impossibility defense and, on the other hand, statutes tainted by a governmental object of self-relief. Such an object is not necessarily inconsistent with a public purpose, of course, and when we speak of governmental "self-interest," we simply mean to identify instances in which the Government seeks to shift the costs of meeting its legitimate public responsibili-

---

40. As Centex observes in its brief, Congress's reaction to the 1988 deals calls to mind Captain Renault's announcement in *Casablanca* that he is "Shocked, shocked!" to discover illegal gambling at Rick's that, in the past, he has tolerated.

41. Defendant insists that Congress targeted the deduction and not the contracts. In this case, however, that is a distinction without a difference because the deduction had already been uniquely linked to the contracts.

ties to private parties. Hence, while the Government might legitimately conclude that a given contractual commitment was no longer in the public interest, a government seeking relief from such commitments through legislation would obviously not be in a position comparable to that of the private contractor who willy-nilly was barred by law from performance. There would be, then, good reason in such circumstance to find the regulatory and contractual characters of the Government fused together ... so that the Government should not have the benefit of the [sovereign acts] defense.

... Hence, governmental action will not be held against the Government for purposes of the impossibility defense so long as the action's impact upon public contracts is ... merely incidental to the accomplishment of a broader governmental objective. The greater the Government's self-interest, however, the more suspect becomes the claim that its private contracting partners ought to bear the financial burden of the Government's own improvidence, and where a substantial part of the impact of the Government's action rendering performance impossible falls on its own contractual obligations, the defense will be unavailable.

... [A] governmental act will not be public and general if it has the substantial effect of releasing the Government from its contractual obligations ....

....

[The] evidence of intense [Congressional] concern with [contracts with the FSLIC regarding the acquisition of failing thrifts] suffices to show that FIRREA had the substantial effect of releasing the Government from its own contractual obligations. Congress obviously expected FIRREA to have such an effect, and in the absence of any evidence to the contrary we accept its factual judgment that this would be so. Nor is Congress's own judgement neutralized by the fact, emphasized by the Government, that FIRREA did not formally

target particular transactions. Legislation can almost always be written in a formally general way, and the want of an identified target is not much security when a measure's impact nonetheless falls substantially upon the Government's contracting partners. For like reason, it does not answer the legislative record to insist ... that the congressional focus is irrelevant because the broad purpose of FIRREA was to "advance the general welfare."

*Id.* at 897–903, 116 S.Ct. 2432 (citations omitted). Nowhere in this passage is it suggested that this general rule regarding the sovereign acts doctrine does not apply to tax legislation. The hypothetical considered by the plurality upon which defendant relies rested on the implicit assumption that the tax law in question did not have the "substantial effect of releasing the Government from its contractual obligations." Here, we have found, in light of the "intense concern with contracts like the one[ ] before us," that the "substantial effect," if not the only effect, of the Guarini legislation was to release the United States from its obligations under the assistance agreements entered into with these plaintiffs and others similarly situated.[42] To find that tax legislation is immune from the *Winstar* plurality's general rule regarding the sovereign acts doctrine would be to place every government contract at the mercy of targeted taxation. This would endanger, not only the Government's contracting partners, but also "the Government's own long-run interest as a reliable contracting partner." *Id.* at 883, 116 S.Ct. 2432.

Contract law does not require government contractors to anticipate blatantly targeted legislation. When the Government enters into a contract, it "impliedly promises to act in good faith and 'invoke its great power of a sovereign act when and only when and to the extent necessary to carry out its essential *governmental* functions.'" *Hughes,* 26 Cl.Ct. at 140 (quoting *Air Terminal Servs., Inc. v. United States,* 165 Ct.Cl. 525, 538, 330 F.2d 974 (1964) (Jones, C.J., dissenting)) (emphasis added); *see also Am. Satellite Co. v. United States,* 26 Cl.Ct. 146, 153 (1992), *rev'd*

---

**42.** Our finding of targeting also distinguishes this case from *Merrion v. Jicarilla Apache Tribe,* 455 U.S. 130, 102 S.Ct. 894, 71 L.Ed.2d 21 (1982), in which there was no suggestion that the tax at issue in that case was targeted at the tribe's contracting partners.

*on other grounds,* 998 F.2d 950 (Fed.Cir. 1993). One of a government contractor's reasonable, legitimate expectations is that Congress will not, through targeted legislation, eliminate its opportunity to reap its share of the benefits it anticipates deriving from the contract. The implied covenant of good faith and fair dealing protects this reasonable expectation. Indeed, as this court has noted, "the purpose of the covenant is to 'protect the reasonable expectations of [contracting] parties.'" *Barsebäck Kraft AB v. United States,* 36 Fed.Cl. 691, 706 (1996) (quoting *Big Horn Coal Co. v. Commonwealth Edison Co.,* 852 F.2d 1259, 1267 (10th Cir.1988)), *aff'd,* 121 F.3d 1475 (Fed.Cir. 1997);[43] *see also United States v. Basin Elec. Power Coop.,* 248 F.3d 781, 797 (8th Cir.2001); *Jarvis v. United States,* 43 Fed.Cl. 529, 534 (1999).[44]

Plaintiffs here legitimately expected that the covered asset loss deduction would not be eliminated through retroactive legislation targeted specifically at assistance agreements entered into by the FSLIC and the FHLBB. This expectation was protected by the implied covenant of good faith and fair dealing that was contained in the Assistance Agreement. When the Guarini legislation was enacted into law in August 1993, the United States breached this implied covenant and became liable for contract damages.

## II. Other Counts

Plaintiffs' remaining counts can be dismissed. Plaintiffs' takings claims, Counts II and VIII, are "conceptually foreclosed," *Plaintiffs in Winstar–Related Cases v. United States,* 37 Fed.Cl. 174, 187 n. 9 (1997), *aff'd sub nom., Ariadne Fin. Servs. Pty. Ltd. v. United States,* 133 F.3d 874 (Fed.Cir.1998), by our finding of contract breach. Plaintiffs' due process claim, Count III, is outside the subject matter jurisdiction of this court. *See N.Y. Power Auth. v. United States,* 42 Fed. Cl. 795, 801 (1999). Plaintiffs' unjust enrichment claim, Count IV, to the extent it is independent of plaintiffs' breach of contract claim, is also outside the subject matter jurisdiction of this court, *see Aetna Cas. & Sur. Co. v. United States,* 228 Ct.Cl. 146, 164, 655 F.2d 1047(1981); *Frank & Breslow, LLP v. United States,* 43 Fed.Cl. 65, 68 (1999); *Dolmatch Group, Ltd. v. United States,* 40 Fed. Cl. 431, 435 (1998), as is plaintiffs' restitution claim, Count V, *see W.P. Bill Atkinson Enters., Inc. v. United States,* 228 Ct.Cl. 886, 888 (1981). We have already rejected the basis for plaintiffs' reformation claim, Count VI. *See* Order of Mar. 28, 2001 at 2. Plain-

---

**43.** Defendant argues that *Barsebäck Kraft* does not support plaintiffs' argument and quotes the following language from the opinion, *Barsebäck Kraft,* 36 Fed.Cl. at 706: "[I]f the parties contract for a provision that provides one party with unconditional discretion, the only reasonable expectations [sic] of the parties is that the party vested with such discretion will exercise that discretion at some point in time." This quotation makes clear, however, that the court's finding was dependent upon the parties having contracted "for a provision that provide[d] one party with unconditional discretion." Defendant argues that the express cooperation clause contained in the contract at issue here is such a provision that limited the Government's duty to act in good faith. However, only an express provision in the Assistance Agreement granting the Government something along the lines of a right to target the contract with hostile legislation would have given the Government the kind of "unconditional discretion" contemplated by *Barsebäck Kraft.* The Assistance Agreement contained no such provision. We reject defendant's argument as its essence is that the Government was free to act in bad faith as long as it did not breach its express good faith promise; this argument would eviscerate the implied duty of good

faith that exists in this contract and in every government contract.

**44.** Citing *Jarvis,* 43 Fed.Cl. at 534, defendant argues that the implied duty of good faith and fair dealing cannot "form the basis for wholly new contract terms." We agree. However, defendant apparently believes that, by ruling in plaintiffs' favor, we are effectively adding a term to the Assistance Agreement guaranteeing a deduction for covered asset losses or, at the very least, providing for indemnification in the event of the elimination of the deduction in contravention of *Hercules, Inc. v. United States,* 516 U.S. 417, 116 S.Ct. 981, 134 L.Ed.2d 47 (1996). As we have stated, however, Congress could have eliminated the deduction without becoming liable for contract damages. *See supra* p. 709. The targeted nature of the Guarini legislation is therefore critical to our finding of breach. Furthermore, *Hercules* is inapposite because that case concerned the question of whether an implied indemnification term or agreement even existed. Here, however, as the Government concedes, the parties' express contract contained the implied covenant of good faith and fair dealing; and this covenant could be independently breached.

tiffs' claim of breach of an implied-in-fact contract, Count VII, is foreclosed by our finding of breach of an express contract. Plaintiffs' frustration of purpose claim, Count IX, and failure of condition claim, Count X, fail to state independent causes of action. Accordingly, Counts II through X are dismissed.

### III. Defendant's Motion to Dismiss Plaintiffs' Request for Pre– Judgment Interest

In their prayer for relief, plaintiffs request pre-judgment interest. *See* Pls.' Compl. at 41. Defendant has moved to dismiss this request, arguing that the United States has not explicitly waived its immunity from the granting of interest on a judgment rendered in this case. Responding to this argument, plaintiffs contend that the court will be in a better position to address defendant's argument during the damages phase of the case. We agree. Consequently, defendant's motion to dismiss plaintiffs' request for pre-judgment interest is denied without prejudice.

### CONCLUSION

Plaintiffs' Comparison of Plaintiffs' Supplemental Proposed Findings of Uncontroverted Fact and Defendant's Statement of Genuine Issues, defendant's Motion to Strike Plaintiffs' "Comparison" of Proposed Findings, plaintiffs' Opposition to Defendant's Motion to Strike, and defendant's Reply in Support of Its Motion to Strike Plaintiffs' "Comparison" of Proposed Findings are filed by leave of court. Defendant's Motion to Strike Plaintiffs' "Comparison" of Proposed Findings is denied. Plaintiffs' Second Renewed Motion for Summary Judgment on Liability is granted in part and denied in part. Defendant's Cross-motion for Summary Judgment is denied. Defendant's Motion to Dismiss is granted to the extent that Counts II through X of the complaint are dismissed. The remainder of defendant's Motion to Dismiss, i.e. that part of the motion seeking dismissal of plaintiffs' request for pre-judgment interest, is denied without prejudice. On or before August 3, 2001, the parties shall file a joint proposed schedule for resolving remaining issues.