CENTEX CORPORATION, et al., Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 96–494C.

United States Court of Federal Claims.

May 24, 2006.

Kent A. Yalowitz, Arnold & Porter, New York, NY, argued for plaintiffs. With him were Jonathan N. Francis, New York, NY, Melvin C. Garbow, Howard N. Cayne, and Thomas R. Dwyer, Washington, D.C., of counsel.

Jeffery T. Infelise, Trial Counsel, Commercial Litigation Branch, Civil Division, United States Department of Justice, argued for defendant. With him were Stuart E. Schiffer, Deputy Assistant Attorney General, David M. Cohen, Director, and Jeanne E. Davidson, Deputy Director, Scott D. Austin and Brian A. Mizoguchi of counsel.

*OPINION*

BRUGGINK, Judge.

Pending in this *Winstar*[1] related contract action are plaintiffs' motions for attorneys' fees and litigation expenses under Rule 54(d)(2) of the Rules of the Court of Federal Claims ("RCFC" or "Rule"), their motion for monetary sanctions under RCFC 37(c), and defendant's motion to strike portions of plaintiffs' reply memorandum in support of their RCFC 54(d)(2) motion for fees. The matter has been fully briefed and orally argued. For the reasons set out below, we deny plaintiffs' Rule 54 motion and defendant's motion to strike. We grant in part plaintiffs' Rule 37 motion.

## BACKGROUND

*The motion for fees under Rule 54(d)*

RCFC 54(d) directs that claims for attorneys' fees and related nontaxable expenses shall be made by motion no later than 30 days after the date of final judgment, as defined in 28 U.S.C. § 2412(d)(2)(G) (2000). The motion must specify the judgment, along with the statute, rule, or other grounds entitling the moving party to the award, and it must state the amount sought. While recognizing the limited bases for shifting fees in the absence of a specific statutory ground for doing so, plaintiffs contended in their opening brief that the government's pre-litigation conduct exhibited such bad faith that it warrants fee shifting. Because of the reliance on pre-litigation conduct, we summarize below a number of facts developed in the record on liability, insofar as necessary to frame up the motion. Because, in their reply brief, plaintiffs shifted the focus of the motion to post-litigation conduct,[2] we separately summarize those facts at a later point in the opinion.

*Pre-litigation Activity*

The background facts can be found in our previous opinions as well as that of the Fed-

---

**1.** *United States v. Winstar Corp.*, 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996).

**2.** Plaintiffs' reliance on post-litigation conduct, while arguably more traditional in a request to

shift fees, is the subject of defendant's motion to strike, because those grounds were not addressed in the lead brief.

eral Circuit. *Centex Corp. v. United States,* 395 F.3d 1283 (2005) *("Centex V"); Centex Corp. v. United States,* 55 Fed.Cl. 381 (2003), *aff'd,* 395 F.3d 1283 (Fed.Cir.2005) *("Centex IV"); Centex Corp. v. United States,* 52 Fed. Cl. 599 (2002) *("Centex III"); Centex Corp. v. United States,* 49 Fed.Cl. 691 (2001) *("Centex II");* and *Centex Corp. v. United States,* 48 Fed.Cl. 625 (2001) *("Centex I").*[3] Familiarity with those opinions is presumed.

Plaintiffs are Centex Corporation ("Centex") and CTX Holding Company ("CTX"). In 1988, the Federal Savings and Loan Insurance Corporation ("FSLIC") approached Centex regarding substantial tax benefits available to Centex if it acquired failing thrifts which were then under FSLIC supervision. The most notable benefit was the ability to shelter its own income by taking tax deductions for the net liabilities of the acquired thrifts. Centex anticipated taking these deductions even though it was to receive FSLIC assistance in the form of compensation for book losses taken on covered assets. Centex contemplated that it would receive both tax deductions for the losses on the covered assets ("covered asset losses" or "CALs") as well as FSLIC reimbursement payments for those same losses, resulting in a permissible "double-dip." Centex agreed to purchase several thrifts based in material part on the tax benefits available from the transaction. The Federal Home Loan Bank Board ("FHLBB") later described the deal as "tax driven."

The agencies involved were clearly aware both of the fact that this was the state of tax law at the time and that such benefits were a material part of the bargain for Centex. For example, the Request for Proposals that the FSLIC delivered to Centex pointed out that under existing tax law, FSLIC assistance payments would not be includible in income. The Request stated:

> [The existing tax] provisions have the effect of permitting an acquiring institution to realize tax benefits attributable to a particular item even though FSLIC assistance is received with respect to such item. For example, if the acquirer receives coverage for capital losses incurred on the disposition of identified assets of the acquired institution, the acquiror is entitled to deduct such loss for federal income tax purposes, notwithstanding that it is reimbursed for the loss by the FSLIC, and that the FSLIC payment is tax free.

App. to Pls.' 2d Renewed Mot. for Summ. J. on Liability at tab 95, page 133 (filed Mar. 22, 2001) ("App. to Pls.' 2d Mot."). Additionally, Raymond Smerge, who held various positions at Centex, testified, in a deposition, as to the subject matter of personal meetings between FHLBB board members and Centex negotiators. Mr. Smerge stated that the agency searched for companies like Centex which had high enough taxable earnings to realize the full tax benefit of the transaction and could share that benefit with the government according to the terms of an Assistance Agreement that the government anticipated entering into with the acquiring institutions. Supp. Mem. in Supp. of Pls.' Mot. for Summ. J. at tab 51, page 36 (filed July 13, 2000) ("Pls.' Mot."); *see Centex III,* 52 Fed.Cl. at 601; *Centex II,* 49 Fed.Cl. at 695.

Centex created CTX as part of its preparation for the transaction. CTX entered into an FHLBB-approved and FSLIC-assisted transaction whereby it acquired Texas Trust Savings Bank, FSB, Llano, Texas ("Texas

---

**3.** In *Centex I,* we held that the plaintiffs had not contractually released their rights to sue, that the relevant tax deductions recognized by the parties were legally available, and that there was no promise by the government regarding the continued availability of those tax deductions. In *Centex II,* we held that the government breached the implied covenant of good faith and fair dealing by enacting the "Guarini" legislation, Omnibus Budget Reconciliation Act of 1993, Pub.L. 103–66, § 13224 107 Stat. 312, 485–86,(1993), which eliminated the tax deductions in a targeted, retroactive fashion. In *Centex III,* we denied defendant's motion to dismiss plaintiff, Centex Corpo-

ration, for lack of standing and held that it and the defendant were contractually bound. Finally in *Centex IV,* we granted in part plaintiffs' motion for summary judgment on damages and held that the passage of the "Guarini" legislation resulted in a loss of over $160 million in covered asset loss ("CAL") deductions, which would have resulted in federal and state tax savings of over $55 million, that plaintiffs were not entitled to have the damages award "grossed up," and that plaintiffs were entitled to recover statutory interest and tax penalties. In *Centex V,* the Federal Circuit affirmed these prior opinions.

Trust") at the end of 1988. On that same day, Texas Trust acquired the assets and assumed the liabilities of four failing thrifts: Peoples Savings and Loan Association, Ranchers Savings Association, Lee Savings Association, and Burnet Savings and Loan Association.

In connection with this acquisition, FSLIC, Texas Trust, and CTX—the sole shareholder of Texas Trust—entered into an Assistance Agreement with FSLIC. In brief, this agreement allowed Centex to take advantage of all tax benefits gained from acquiring the failing thrifts. It also, however, required Centex and FSLIC to share those benefits. The Assistance Agreement required Centex to share with FSLIC fifty percent of all tax benefits produced. "The Assistance Agreement specifically identified the shared tax benefits as including deductions for losses on covered assets, deductions for worthless or partially worthless debts, or deductions for increases in bad debt reserves." *Centex V*, 395 F.3d at 1288.

Plaintiffs are able to point to a number of actions taken by agency officials which were inconsistent with the positions they took when inducing plaintiffs to acquire the failing thrifts. Almost from the moment the Centex deal was closed, the press began carrying stories criticizing FHLBB for entering into the late–1988 deals with acquirers like Centex. As a result of the bad press, many officials in the agency thought it best to end the tax treatment given to banks entering into these assistance agreements. In fact, many of the very same agency officials who were using the "double dip" to entice Centex to enter into the Assistance Agreement were now advocating a change in the law.

In January 1989, a hearing regarding the FSLIC assistance programs was held before the House Committee on Banking, Finance and Urban Affairs. Board Member White testified at this hearing regarding the taxability of capital losses: "What we have got are tax benefits stretched over 10 years of

the contract.... It is the non-taxability on the capital loss that extends over 10 years." *FSLIC Assistance Programs: Hearing before the House Comm. on Banking, Finance and Urban Affairs*, 101st Cong. 44 (1989). Several members of Congress criticized the late–1988 deals for having cost the Treasury too much in foregone tax revenues. *See id.* at 8, 12–13, 50. More press criticism followed.

In August 1989, Congress repealed the FSLIC tax benefit provisions[4] after the House Committee on Ways and Means reported that "the tax subsidy provided to financially troubled financial institutions through more favorable tax rules than those applicable to other taxpayers is an inefficient way to provide assistance to such institutions." H.R.Rep. No. 101–54, at 25 (1989), U.S.Code Cong. & Admin.News 1989, pp. 86, 356. However, this repeal was only effective with respect to transactions completed on or after May 10, 1986. It had no impact, therefore, on the tax benefit aspects of the Centex transaction.

Review of agreements with institutions like Centex continued after the enactment of FIRREA. Those who had been counsel and advisors to FSLIC when it entered into the agreements expressed previously unexpressed doubt as to whether the deduction ever existed at all. For example, in June of 1990, Donald Susswein, a partner in Thacher Proffitt & Wood, stated in a memorandum:

> In reviewing the treatment of covered assets, however, we concluded that there is *substantial doubt* as to whether a widely held perception of the applicable tax law—as allowing the realization of a tax loss when the holder of a covered asset is fully compensated for any shortfall between the amount received upon disposition and the asset's tax basis—is consistent with the applicable statutory provisions and long-standing IRS published ruling positions.

*Centex II*, 49 Fed.Cl. at 701 (emphasis added). However, in 1988, Mr. Susswein had

---

4. This legislation was passed as the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA"), Pub.L. No. 101–73, 103 Stat. 183. FIRREA abolished the FSLIC and FHLBB and created in their place the Federal

Deposit Insurance Corporation and three agencies; Resolution Trust Corporation ("RTC"), the Office of Thrift Supervision, and the Federal Housing Finance Board.

acknowledged the existence of the deduction in a memorandum to the FSLIC. *See Id.* at 701–02. Apparently taking a different view after criticisms of the deals surfaced, Mr. Susswein suggested that Congress or the IRS "clarify" that the deductions did not exist. Mr. Susswein made such a suggestion knowing that a change in the law would be viewed by the acquiring institutions as a breach of contract:

> [T]he aggrieved party could maintain that a change or clarification of the tax law affecting that agreement would warrant a modification to the related contractual provision. In this regard a clarification of the tax law—by Congress or by the IRS—would not prevent an aggrieved party from pursuing remedies that may be available as a matter of contract law.

Mem. from Donald Susswein and Jeremiah Buckley to Lou Wright at 15 (Aug. 16, 1990). Similarly, William Seidman, Chairman of the Federal Deposit Insurance Corporation ("FDIC"), who advocated the tax benefits before congressional staff in 1988, began promoting a retroactive repeal of the deduction, stating that "savings to the Government could be significant." *Centex II,* 49 Fed.Cl. at 702. Congress then adopted the Guarini amendment as § 13224 of the Omnibus Budget Reconciliation Act of 1993. Pub.L. No. 103–66, 107 Stat. 312, 485 (1993).

Without summarizing all similar evidence upon which plaintiffs rely in their current motion, we are sympathetic to plaintiffs' characterization of the change in positions by agency officials and others as something of a "bait and switch." Whether that is sufficient to warrant fee shifting, we explore below.

*Post-litigation grounds asserted for fee-shifting*

In their reply brief to the motion under Rule 54, plaintiffs add to the grounds for relief the asserted misconduct by the Department of Justice during litigation in this court. Specifically, they argue that certain aspects of discovery "required an unusually heavy motion practice," that three arguments against liability were weak to the point of being offered in bad faith, and finally that defendant's refusal to admit the quantum of damages, which was the subject of requests for admission, was done in bad faith. (In this latter respect, the grounds for the request for fees under Rule 54 and the motion for fees under Rule 37 merge. The Rule 37 motion is predicated on post-litigation discovery conduct.) The first two grounds cited, motion practice and weak arguments, do not require a separate presentation of factual background. The latter, the government's conduct with respect to proof of damages, does require some background and will be explained with the background for the Rule 37 motion.

*The motion for fees under Rule 37(c)*

The grounds for the motion under Rule 37(c) are asserted under two separate paragraphs of the rule. The gist of plaintiffs' complaint under paragraph (1) of Rule 37(c) is that defendant's late presentation of amendments to its expert report on damages was prejudicial in terms of wasted time and expense. Plaintiffs' complaint under paragraph (2) is that defendant's refusal to admit the quantum of damages, propounded in a set of requests for admission, also prejudiced them in terms of wasted time and expense. A brief review of the procedural background is necessary.

We granted summary judgment to plaintiffs on liability on July 6, 2001, and opened discovery relating to damages. *See Centex II.* Plaintiffs' damage claim was predicated on records generated shortly after the time of the acquisitions and updated thereafter concerning the book and tax bases of covered assets. The damage calculation was assembled in a report by Mr. Jeff Mason, of Centex's tax department. He was able to trace each asset's book and tax bases in detail from 1990 to the time of the termination agreement. Prior to the Guarini legislation, these had formed the basis for deductions successfully claimed by Centex. Mr. Mason also used these records to demonstrate the effect on lost tax deductions post-Guarini. The basis for Mr. Mason's calculations was made fully available to the Department of Justice and the government's expert, Mr. William Wolf.

On October 21, 2001, plaintiffs served on

defendant a set of requests for admission.[5] There were 10 requests for admission which covered five time periods, with one pair of consecutive requests, first an odd, then an even numbered, addressing each specific time period. Each odd-numbered request was phrased identically, except for the statement of the time period in question and the dollar amount associated with that time period. Likewise, the even numbered requests were similarly phrased.

Request number one, which is representative of the odd-numbered requests, stated: "[d]uring the period beginning March 4, 1991 and ending March 31, 1991, Centex incurred [CALs] for which the FDIC made assistance payments under section 3(a)(1) of the Assistance Agreement in the amount of $362,398." App. to Mem. in Supp. of Rule 37(c) Mot. for Fees at tab 9 (filed May 5, 2003). The government's response to this request is representative of the odd-numbered responses and contained the following:

> Defendant further objects to the request in that this request calls for discovery of expert opinion prior to the applicable deadline established by the Court in its order and that the defendant has not yet had an adequate opportunity to conduct fact discovery and to develop an expert opinion on this issue. The defendant is studying this issue and expects to provide an expert report addressing this issue in February 2002 when our expert report is due.... [T]his is a very technical and complicated area in need of expert study and exposition.... To the extent that a response to this request for admission is required prior to completion of fact discovery and prior to the date upon which our expert report is due, it is denied.

App. to Def.'s Opp'n to Pls.' Rule 37(c) Mot. for Fees at 5 (filed Dec. 9, 2005).

Request number two, which is representative of the even-numbered requests stated: "[i]n computing its final federal income tax liability for the taxable year ending March 31, 1991, Centex Took Into Account $362,398 of [CALs] Reimbursements as required by Section 13224." App. to Mem. in Supp. of Rule 37(c) Mot. for Fees at tab 9 (filed May 5, 2003). "Took Into Account" was defined in the set of requests as "(a) with respect to a loss for purposes of [I.R.C. § 165], took such a loss into account as compensation for such loss, and (b) with respect to a debt for purposes of [I.R.C. §§ 166, 585, 593], took into account in determining whether such debt is worthless or partial worthlessness of such debt." *Id.* The government's response to this request is representative of the even-numbered responses:

> Defendant further objects to the term "Took Into Account" as vague and incomplete, and as calling for a legal conclusion. Defendant also objects to the request in that this request calls for the discovery of expert opinion prior to the applicable deadline established by the Court in its order and that the defendant has not yet had an adequate opportunity to conduct fact discovery and to prepare an expert report addressing this issue. The defendant is studying this issue and expects to provide an expert report addressing this issue in February 2002 when our expert report is due. We believe that this area of law is complex and necessitates expert opinion. Indeed, plaintiffs have offered their own expert to address this issue. In addition, defendant objects to this request in that it calls for a legal conclusion. To the extent that a response to this request for admission is required prior to completion of fact discovery and prior to the date upon which our expert report is due, it is denied.

App. to Def.'s Opp'n to Pls.' Rule 37(c) Mot. for Fees at 6 (filed Nov. 9, 2005). These responses were never supplemented. Plaintiffs argue that the subsequent need to prove the accuracy of their figures for the difference in book-tax basis upon acquisition in connection with establishing the entitlement to deductions was necessitated by the government's failure to answer this request for admission.

Plaintiffs also point to other discovery-related conduct by the government as grounds

---

**5.** Centex issued its first set of 10 requests for admission on October 18, 2001. On October 23, 2001, it issued a second set of requests amending incorrect dollar values in requests numbered nine and ten.

for sanctions. The court's order containing a discovery schedule for the damages portion of the case provided that plaintiffs furnish their expert report on October 31, 2001, and that defendant furnish its expert report by February 27, 2002. All discovery was to be concluded by April 26, 2002. Both parties timely submitted their expert reports. In January 2002, the government deposed Mr. Mason and other Centex personnel. Plaintiffs deposed defendant's expert, Mr. Wolf, in March of 2002.

Mr. Wolf's first report indicated that he agreed with certain elements of Mr. Mason's damage calculation but could not agree with ultimate conclusions. During Mr. Wolf's deposition and during his testimony at trial, it became clear that Mr. Wolf took issue with the beginning tax basis that Mr. Mason had used in his damage calculations. Mr. Wolf assumed, for lack of better figures, the numbers relied upon by Mr. Mason, but he did not concede their accuracy.

After extensive discovery the parties filed cross-motions for summary judgment on damages. As part of the briefing on summary judgment, defendant offered a document purporting to set out an alternative means of approaching damages. The parties subsequently referred to this document as the "recalibration schedule." The document was unattributed, but we assumed, in denying plaintiffs' motion to strike the document, that it could be defended by counsel from existing documents submitted in support of the cross-motions. The court also permitted Mr. Wolf to submit a supplemental expert report on August 23, 2002. In doing so, the court denied plaintiffs' motion to strike the report and for monetary sanctions.

In this new report, Mr. Wolf took the earliest figures that he felt he could be sure of for the tax basis of the covered assets and attempted to "walk back" to determine what the tax basis was upon acquisition. His conclusion was that the minimum beginning aggregate book-tax basis difference was $88.8 million, not the $47.7 million alleged by Centex. At oral argument, the court announced that plaintiffs could depose Mr. Wolf again, to minimize prejudice flowing from the supplemental report. We delayed ruling on summary judgment, however, until we heard directly from Mr. Mason and Mr. Wolf. This was done at defendant's urging and because the court was confused about the significance of Mr. Wolf's criticisms.

Nine days before the hearing, and after Mr. Wolf's second deposition, defendant withdrew Mr. Wolf's supplemental expert report as well as its request for a trial. The hearing went on as scheduled, however, and lasted one day. During that hearing, it became apparent that the recalibration schedule was prepared by Mr. Wolf, in conjunction with other persons who never testified or submitted affidavits. It could not be defended from existing documents and it in fact should have been stricken as late expert material. It also became apparent that the schedule contained substantial errors. Ultimately we ruled in favor of plaintiffs. Our findings with respect to damages are set out in *Centex IV*, which was subsequently affirmed in *Centex V*.

It is not unfair to characterize the one-day trial as prompted in large part by confusion engendered by Mr. Wolf in general and specifically by his supplemental expert report and the recalibration schedule. As we explain in *Centex IV*, what appeared at first examination to be serious challenges to the methods and sources plaintiffs relied on to calculate damages turned out, at the end of the hearing, to amount to Mr. Wolf's unwillingness to concede that plaintiffs' numbers were reliable. While Mr. Wolf was under no obligation to endorse plaintiffs' claim, his report ultimately amounted to much sound and fury, signifying nothing which lead to any credible reason to adjust plaintiffs' figures or methods.

## DISCUSSION

### The Rule 54(d) motion

Defendant argues that the Rule 54(b) motion is untimely. This is based on the assumption that the motion is, in reality, a late-filed request for reconsideration of the court's failure to include within the damages award these same costs and fees, as well as the court's failure to rely on pre-litigation agency conduct to support the breach find-

ing. We disagree. Plaintiffs are entitled to seek fees under Rule 54(b) *after* judgment is entered. They either succeed or fail on the merits of that motion under the standards implicitly recognized within the rule. The fact that the request for fees would be untimely if advanced under a different procedural mechanism and a different theory is irrelevant. Plaintiffs timely made their motion.

Defendant also makes the argument that the government's decision to pay the merits judgment bars a post-judgment claim for fees, citing 28 U.S.C. § 2517(b), which cautions that payment of a judgment constitutes a full discharge of all claims arising out of the matters "involved in the case." The government's argument is peculiar. The award of costs and fees permitted by 28 U.S.C. § 2412(b) is plainly contemplated to be a judgment *separate* from the merits judgment. Rule 54(d) specifically permits the motion to be made "no less than 14 days *after* judgment." (Emphasis added.) Section 2412(c)(2) even contemplates that the separate award for fees shall be paid "as provided in section[ ] ... 2517." Indeed, there is every reason for the trial court to abide the outcome of the appeal. Presumably if the lower court ruling is reversed, the rationale for fees would be in jeopardy.

Nothing in the statute or rule suggests that once the appellate process is at an end, the race is then on for the trial court to resolve the motion for fees before the defendant can pay the judgment and cut off consideration of fees. The government's argument amounts to this: because the government paid the merits judgment before the request for fees under Rule 54 had been adjudicated in this court, the government cut off the court's ability to rule on the motion. Such a possibility would be nonsensical. Plainly, one party cannot deprive the court of jurisdiction to grant an otherwise-timely motion for fees under section 2412.

Defendant's third argument against consideration of the merits of the request for fees is that the parties' termination agreement, entered into in December 1994, precludes a claim for fees. Defendant correctly points out that the termination agreement released the FDIC and its agents and successors from any further actions arising from the assistance agreement. The underlying claim here could proceed, of course, because, as we held in related litigation, the termination agreement specifically excepted claims arising out of the Guarini legislation. *See First Nationwide Bank v. United States,* 48 Fed.Cl. 248, 259 (2000). Defendant is apparently arguing that, despite the fact that the present cause of action for breach of contract was specifically excluded from the release, there also had to be, within the termination agreement, an additional recognition of the possibility that plaintiffs might win such a suit and try to collect fees associated with that victory. If the merits of the present action were excluded from the waiver, then obviously there does not need to be an additional exclusion for costs or fees.

Finally, we address the merits of the request for fees under Rule 54. Plaintiffs acknowledge that the presumption under the so-called "American rule" is that successful parties absorb their own attorneys' fees.[6] Nevertheless, as they point out, the United States "shall be liable for such fees and expenses to the same extent that any other party would be liable under the common law or under the terms of any statute which provides for such an award." 28 U.S.C. § 2412(b). While plaintiffs concede that no statute[7] grants them a right to fees, they point to a common law exception which arises whenever a party has " 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons.' " *Chambers v. NASCO, Inc.,* 501 U.S. 32, 46, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991) (quoting *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y,* 421 U.S. 240, 259, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975)).

---

6. *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y,* 421 U.S. 240, 247, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975) ("In the United States, the prevailing litigant is ordinarily not entitled to collect a reasonable attorneys' fee from the loser.").

7. Plaintiffs would not be eligible under the Equal Access to Justice Act, 28 U.S.C. § 2412(d)(1)(A) because they exceed the net worth limitation of § 2412(d)(2)(B).

■ The beginning point for exploring exceptions to the "American rule" has to be *Alyeska Pipeline Service Co.:*

> [A] court may assess attorneys' fees for the "willful disobedience of a court order ... as part of the fine to be levied on the defendant, *Toledo Scale Co. v. Computing Scale Co.,* 261 U.S. 399, 426–428, 43 S.Ct. 458, 67 L.Ed. 719 (1923)," *Fleischmann Distilling Corp. v. Maier Brewing Co.,* 386 U.S., at 718[, 87 S.Ct. 1404, 18 L.Ed.2d 475 (1967)]; or when the losing party has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons...." *F.D. Rich Co.[, Inc. v. U.S.],* 417 U.S. [116], at 129[, 40 L.Ed.2d 703 (1974)] (citing *Vaughan v. Atkinson,* 369 U.S. 527, 82 S.Ct. 997, 8 L.Ed.2d 88 (1962)); *cf. Universal Oil Products Co. v. Root Refining Co.,* 328 U.S. 575, 580, 66 S.Ct. 1176, 90 L.Ed. 1447 (1946). These exceptions are unquestionably assertions of inherent power in the courts to allow attorneys' fees in particular situations, unless forbidden by Congress....

421 U.S. 240, 258–59, 95 S.Ct. 1612, 44 L.Ed.2d 141. It is undisputed, therefore, that the interaction between section 2412(b) and *Alyeska* leaves room for plaintiffs' request for fees, although the "bad faith" exception is plainly narrow. *See SEC v. Zahareas,* 374 F.3d 624 (8th Cir.2004).

In their opening brief, plaintiffs point to pre-litigation conduct to demonstrate the bad faith required to shift fees. The facts relied on are, in large measure, the same ones cited by this court and the Court of Appeals for the Federal Circuit as relevant to the breach of the covenant of good faith and fair dealing. Many of those facts are summarized above. Plaintiffs also cite, however, other materials from the liability proceedings which emphasize the knowledge of agency representatives that their encouragement of Congress' adoption of what ultimately became the Guarini legislation would be viewed by plaintiffs as a breach of contract and would likely trigger litigation.

In its response brief, defendant argues, among other things, that the same facts giving rise to liability cannot now be relied·upon to support the demand for fee shifting. Plaintiffs therefore, in their reply brief, cite events after the filing of the complaint in support of the fee request. This, in turn, triggered defendant's motion to strike those portions of the reply brief to the Rule 54 motion, because they go beyond the grounds initially offered. Defendant thus urges the court to consider neither the government's pre– nor post-filing conduct in evaluating the motion.

In view of our denial of the Rule 54(b) motion on its merits, explained below, we can deny as moot defendant's motion to strike. Even after considering the additional post-filing grounds for the motion, we would deny plaintiffs' request.[8]

Defendant combines in one sentence two distinct arguments in opposition: "Centex cannot recover attorney fees for alleged bad faith in acts that occurred prior to litigation and that gave rise to its substantive claim." Def. Opp. at 14 (Oct. 24, 2005). Although these arguments are related, they must be separately approached. As to the first, we believe that defendant overstates the irrelevance of pre-litigation conduct. In *Vaughan v. Atkinson,* for example, the Court recognizes the relevance of pre-litigation conduct:

> In the instant case respondents were callous in their attitude, making no investigation of libellant's claim and by their silence neither admitting nor denying it. As a result of that recalcitrance, libellant was forced to hire a lawyer and go to court to get what was plainly owed him under laws that are centuries old.

369 U.S. 527, 82 S.Ct. 997, 8 L.Ed.2d 88 (1962), *cited in Alyeska,* 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141.

Although the Court of Appeals for the Federal Circuit does not appear to have spoken to the question, other circuit courts have

---

**8.** Our willingness to entertain these grounds for the motion should not be construed as agreement with plaintiffs that their reply brief in support of fees under Rule 54 appropriately raised new bases for granting the request. Reliance on post-filing conduct fundamentally changed the theory of the request and, if the court were of the view that this conduct warranted a shifting of fees, we either would have permitted further briefing by defendant or struck the reply brief.

relied on pre-litigation conduct in assessing whether to shift fees. In *McEnteggart v. Cataldo,* 451 F.2d 1109, 1112 (1 st Cir.1971), a discharged employee "was forced to go to court to obtain the statement of reasons to which he was constitutionally entitled." The court cited that fact as relevant to whether to shift fees. Similarly, in *American Hospital Ass'n v. Sullivan,* the United States Court of Appeals for the District of Columbia recites that bad faith "in conduct giving rise to the lawsuit may be found where 'a party, confronted with a clear statutory or judicially-imposed duty towards another, is so recalcitrant in performing that duty that the injured party is forced to undertake otherwise unnecessary litigation to vindicate plain legal rights.' " 938 F.2d 216, 219 (D.C.Cir.1991) (quoting *Fitzgerald v. Hampton,* 545 F.Supp. 53, 57 (D.D.C.1982)). The D.C. Circuit also cites *American Employers Insurance Co. v. American Security Bank,* 747 F.2d 1493, 1502 (D.C.Cir.1984), which states that exceptions to the American rule allow an award of attorneys' fees "when the party has been the victim of unwarranted, oppressive, or vexatious conduct on the part of his opponent and has been forced to sue to enforce a plain legal right." *See also Zahareas,* 374 F.3d 624 (8th Cir.2004) (citing *American Hosp. Ass'n); Mar. Mgmt., Inc. v. United States,* 242 F.3d 1326 (11th Cir.2001) (noting that the exception also encompasses bad faith acts preceding and during litigation). Admittedly, these decisions reflect a concern with abuse of the judicial process, but it is an overstatement on defendant's part to go further and say that under all circumstances pre-litigation facts are irrelevant to determining whether to award fees.

We do not, however, endorse plaintiffs' characterization of the law. Plaintiffs cite a number of decisions in which pre-litigation bad faith conduct was the basis for shifting fees. For example, plaintiffs cite *Universal Oil Products Co. v. Root Refining Co.,* 328 U.S. 575, 580, 66 S.Ct. 1176, 90 L.Ed. 1447 (1946), for the proposition that the question is whether defendant's acts of bad faith gave rise to an "avoidable" lawsuit. With hindsight and a certain amount of realism, presumably every lawsuit is avoidable. What the Court in *Universal Oil* was concerned about, however, was conduct suggesting that "fraud has been practiced upon it, or that the very temple of justice has been defiled." 328 U.S. at 580, 66 S.Ct. 1176.

Other decisions are also distinguishable. *Vaughan,* 369 U.S. at 530–32, 82 S.Ct. 997, for example, was an action in admiralty in which the Court emphasized the equitable nature of the underlying claim for "maintenance and cure." The defendant's refusal to take care of the sailor was "willful and persistent" and put at jeopardy someone who was medically incapacitated. *Id.* Similarly, other instances in which courts have upheld the shifting of fees for pre-litigation bad faith have involved fiduciary, or quasi-fiduciary relationships. *See, e.g., Barton v. Drummond Co.,* 636 F.2d 978 (5th Cir.1981) (explaining that attorneys' fees can only be awarded upon a finding of a breach of a fiduciary duty in suit brought by shareholders against a corporation); *Richardson v. Commc'n Workers of Am.,* 530 F.2d 126 (8th Cir.1976) (noting that the union's failure to discharge its fiduciary duty was bad faith sufficient for an award of attorneys' fees). And in *American Hospital Ass'n,* although the conduct occurred outside of the litigation at bar, there had been previous court proceedings directly connected to the relevant agency conduct which had prompted further litigation. 938 F.2d at 220. In *Maritime Management,* the litigation followed immediately on adversarial administrative proceedings. 242 F.3d at 1328.

■ We believe that the most plaintiff-favorable expression of the rule that could possibly apply under the present circumstances is set out in *Sanchez v. Rowe,* 870 F.2d 291, 295 (5th Cir.1989): "We hold that the requisite bad faith may be found in a party's conduct *in response* to a substantive claim, whether before or after an action is filed, but it may not be based on a party's conduct *forming the basis* for that substantive claim."

■ In this case, there was no substantive claim advanced prior to litigation. It is true, as plaintiffs point out, that in this instance there was no occasion for such a formal pre-litigation claim. Should that serendipity

matter? We think not. In the absence of a clear event distinguishing between the substance of a claim and its procedural treatment, the risk is that fees become part of the remedy for the breach. As Justice Scalia cautioned in his dissent in *Chambers*, 501 U.S. at 59, 111 S.Ct. 2123 (Scalia, J., dissenting), failing to maintain that distinction would thwart the general rule against what he referred to as "substantive fee shifting, that is, fee shifting as part of the merits award." *See also McLarty v. United States* 6 F.3d 545 (8th Cir.1993); *United States v. Dantzler Lumber & Exp. Co.*, 833 F.Supp. 927, 932 (Ct. Int'l Trade 1993).

In this case, the events upon which plaintiffs rely cannot be said to relate to government officials failing to give attention to a legitimate claim. Nor, if it were relevant, can they be construed as egregious conduct that undermines the judicial process. While the adoption of the legislation and the agencies' lobbying efforts to that end were a breach of the government's obligation of good faith treatment of its contracting partners, the conduct was not an assault on legal processes in any way. We agree with defendant, in sum, that it is inappropriate in these circumstances to consider pre-litigation conduct.

 Even if we were to consider the conduct plaintiffs rely on, in any event, we would deny the motion for the second reason suggested by defendant, namely, the grounds are the same as those on which liability was found. Plaintiffs point to the same findings made by this court in connection with our ruling that there had been a breach of contract: government agents represented to plaintiffs that the "double dip" tax benefits were available, those agents lobbied Congress, first to extend legislation making the acquisitions financially attractive, and then to withdraw those tax incentives, and the legislation was crafted in such a way that the United States seized to itself the very tax advantages which had prompted plaintiffs to unburden the bank regulators of the risky bank assets. We concluded that this conduct was a breach of the covenant of good faith and fair dealing.

In mustering the evidence in support of their motion, plaintiffs are careful to rely on the actions of regulators or their agents. Plaintiffs also assemble substantial evidence that the regulators knew that the legislation would be viewed as a reneging on the contract and would likely prompt litigation. Presumably, this is to avoid defendant's argument that the same facts giving rise to the underlying cause of action cannot be the basis for fees. In our merits opinion, we declined to rely on the agencies' lobbying efforts and changes of position in determining that there had been a breach of contract, *see Centex II*, 49 Fed.Cl. at 707 n. 35, thus leaving room for plaintiffs now to point to actions of employees of those agencies and thus avoid the prohibition on "substantive" fee shifting.

We limited our prior ruling, however, because it was unnecessary to go beyond the adoption of the legislation itself to find a breach. Moreover, relying on the agencies' conduct would have required addressing unnecessarily the government's defense that such arguments were legally barred by the termination agreement. As we indicated there, the agencies' conduct was part of the background leading up to the legislation. Indeed, the only reason the agencies' conduct was arguably relevant to the breach was that it prompted Congress to enact the breaching legislation. Thus, even if agency pre-litigation conduct might otherwise be grounds for fee shifting, there is no meaningful way, in terms of the breach, to separate action of the agencies from that of Congress. If fees cannot be awarded when the basis for awarding fees is fundamentally the same as the basis for the substantive claim, then plaintiffs' attempt to segregate the conduct of the agencies from that of Congress is of no effect. There was only one breach, and if we had swept into our prior holding the agencies' conduct, it would not have altered the outcome or the damages.

The rationale for excluding from fee consideration the same facts giving rise to liability were articulated in *Shimman v. International Union of Operating Engineers, Local 18*, 744 F.2d 1226, 1231 (6th Cir.1984):

To allow an award of attorney fees based on bad faith in the act underlying the substantive claim would not be consistent with the rationale behind the American Rule regarding attorney fees. By refusing to penalize a litigant whose judgment concerning the merits of his position turns out to be in error, the American Rule protects the right to go to court and litigate a non-frivolous claim or defense. The unsuccessful litigant is not penalized even when an injured party whose claim is upheld is not made completely whole because of the cost of litigation. The unsuccessful litigant may be penalized, however, if the litigation was not maintained in good faith. In such a case, the successful party has ordinarily suffered two wrongs: one in the events giving rise to the litigation, and another in the wrongful conduct or instigation of the litigation. Attorney fees incurred while curing the original wrong are not compensable because they represent the cost of maintaining open access to an equitable system of justice.

We agree. In sum, we may not base an award on the same conduct which gave rise to a finding of liability. We conclude that pre-litigation conduct cannot support an award of fees under Rule 54.

██ With respect to the post-litigation conduct to which plaintiffs point in connection with their Rule 54(d) motion, plaintiffs contend that certain government arguments and defenses were not presented in good faith. They bring up the following:

> During the liability phase, and on appeal, defendant argued that the Termination Agreement cut off Centex's rights, even though the FDIC's own witnesses ... testified during the damages phase that it was plainly their intent and understanding that Centex would preserve and pursue the claim in this case.

> Defendant unreasonably contested the deductibility of CALs, maintaining a position that the Federal Circuit rejected as "impossible." *Centex*, 395 F.3d at 1304....

> During the damages phase, defendant dreamed up its "Centex has no standing"

argument—which this court and Federal Circuit summarily rejected as well.

Pls' Reply at 19–20 (filed Nov. 16, 2005).

There is no question that this court and the Federal Circuit have expressed impatience with some of the government's arguments in this and related litigation. *See, e.g., Centex V*, 395 F.3d at 1305 (characterizing defendant's contention that the Guarini legislation was not targeted as "frivolous"); *Temple-Inland Inc. v. United States*, 68 Fed.Cl. 561, 566 (2005) (rejecting the contention that the bank should have mitigated damages by accelerating losses to earlier years when the deduction was available as "doubly bizarre"). The government's response to the pending motion itself includes the marginal defenses addressed above. Indeed, we can agree with the plaintiffs that the government's conduct of the substantive aspects of this litigation has unquestionably added unnecessary confusion and delay to resolving these Guarini cases.

More, we are unwilling to say, however. This series of cases has been difficult for both sides. Plaintiffs advanced very large claims on a number of theories of liability; all but one of the theories were either rejected or not necessary to the outcome. The contract found in this case is hardly of the garden-variety type. The fact that it arose in a regulated context, and it assumed the existence and validity of certain legislation, made it unusual and naturally prompted defenses related to the sovereign acts doctrine. The fact that most of these arguments were rejected, and even in strong terms, does not mean they were offered in bad faith.

In litigation as unique as this, when the outcome is uncertain and the stakes high, it is inevitable that both sides will launch what can charitably be called secondary and tertiary arguments. While some of the arguments rejected were weak, that is not a basis, in our view, which overcomes the strong presumption against shifting all fees generated in prosecuting the case, at least so long as meritorious arguments are advanced as well. It was fair argument, for example, for the government to contend that the lawsuit impinged on executive and legislative powers. It was fair argument to contend

that there was no promise that the deduction would continue into the future. In addition, the availability of a tax deduction, although plainly assumed by the contracting parties, was not, strictly from the standpoint of statutory construction, so apparent that an argument to the contrary was absurd.

In short, while the government made and persisted in a number of weak arguments, that fact alone is insufficient to warrant shifting fees. Nor does the result change when we either consider that there was stiff resistance to production of certain documents, prompting "heavy motion practice," or when we take account of the fumbling prompted by defendant's reliance on its damages expert. While these things lengthened the litigation, even collectively this conduct does not rise to the level of acting in "bad faith, vexatiously, wantonly, or for oppressive reasons." *See Alyeska,* 421 U.S. at 259, 95 S.Ct. 1612.

*The Motion for Sanctions Under Rule 37(c)*

Judgment was entered on February 26, 2003 for $28,101,105, with costs to plaintiffs. Plaintiffs filed their motion seeking the imposition of Rule 37 sanctions on May 5, 2003. Unlike the Rule 54 motion, which seeks to shift all fees and expenses, plaintiffs' motion under Rule 37 is limited to only a portion of fees and expenses.

Rule 37(c)(1) states, in relevant part:

A party that, without substantial justification fails to disclose information required by RCFC 26(a) or 26(e)(1), or to amend a prior response to discover ... is not, unless such failure is harmless, permitted to use as evidence at a trial ... or on a motion any witness or information not so disclosed. In addition to or in lieu of this sanction, the court .... may impose other appropriate sanctions.

Rule 26(a) and (e) relate, in part, to the continuing obligation to furnish information about anticipated expert testimony. In short, motions under Rule 37(c)(1) can be directed at failing to meet discovery obligations related to experts.

Paragraph (2) of the same rule provides:

If a party fails to admit the genuineness of any document or the truth of any matter as requested under RCFC 36, and if the party requesting the admissions thereafter proves the genuineness of the document or the truth of the matter, the requesting party may apply to the court for an order requiring the other party to pay the reasonable expenses incurred in making that proof, including reasonable attorney's fees. The court shall make the order unless it finds that (A) the request was held objectionable pursuant to RCFC 36(a), or (B) the admission sought was of no substantial importance, or (C) the party failing to admit had reasonable ground to believe that the party might prevail on the matter, or (D) there was other good reason for the failure to admit.

Rule 37(c)(2), is thus directed at failures to respond properly to requests for admission.

Relying on this language, plaintiffs contend they should receive fees and expenses incurred in connection with two aspects of the litigation. First, plaintiffs argue that under Rule 37(c)(1), they are entitled to fees and expenses because the second Wolf expert report and the recalibration were submitted in violation of the court's scheduling order. Under Rule 37(c)(2), they argue that the value of deductions lost due to Guarini was "the subject of requests for admissions that should have been admitted but never were." Pl. Mot. at 1 (filed May 5, 2003). Specifically, plaintiffs point to the effort involved in "proving that Centex received $160.8 million in FSLIC reimbursements for [CALs] and took the $160.8 million into account as compensation for purposes of figuring its federal and certain state income tax liabilities during the damages period." *Id.*

We will deal with the 37(c)(2) aspects of the motion first. As we explained in the factual background, plaintiffs submitted requests for admission which defendant objected to answering. That response was not supplemented. Plaintiffs contend that if defendant had admitted earlier that it had no basis for disputing the requested admissions, the hearing would have been unnecessary.

Defendant responds that, irrespective of the propriety of its failure to admit, the refusal was not the cause-in-fact of plaintiffs' need to prove the $160 million figure for lost

deductions. Defendant argues that the language of the requests for admission addresses the amount of FSLIC assistance received, a figure which is not necessarily equal to the quantum of lost CAL deductions.

It is undisputed that each asset covered in the assistance agreement carried both a book basis and a tax basis. Confusion centered around one fact issue—the tax basis of the covered assets at acquisition, which would be different from the book basis if Centex took charge-offs on the assets for tax purposes before charge-offs were taken on those same assets for book purposes. An asset's book basis is the number used to determine the quantum of loss upon disposition for purposes of calculating the amount of FSLIC assistance owed under the assistance agreement. The tax basis is the number used to calculate the loss on a particular asset upon disposition for income tax purposes. If an asset has a tax basis different from its book basis, upon disposition, the amount of FSLIC assistance received for such loss would be different from the tax deduction available for such loss. Thus, in defendant's view, even if it had admitted the amount of assistance received, which was the subject of the requests for admission, plaintiffs would have been no closer to proving the number at issue, which was the value of the lost deduction.

With respect to the failure to respond substantively to the requests for admission, we agree with defendant. There is no dispute that defendant never updated its responses to the requests for admission. It is also the case that the government never put on evidence to contradict these proposed admissions. It is equally the case, however, that if these requests were deemed admitted, plaintiffs still would have had to put on independent proof of damages. This is because, while proof that plaintiffs took certain covered asset losses and received reimbursements is circumstantial evidence of eligibility for deductions, it is not necessarily sufficient proof. Plaintiffs still would have had to put together and defend the Mason calculations.

Each odd-numbered request asked the government to admit a dollar value of CALs for which the FDIC reimbursed plaintiffs. This figure relates only to the book basis of the assets at issue. Without establishing the difference between book basis and tax basis, this information, even if admitted, would have left the value of lost deductions unproven. Each even-numbered request asked the government to admit a dollar value for FDIC reimbursements that Centex "took into account" when computing its federal income tax liability. The admission sought in this request is even less helpful to Centex for proving the value of lost deductions. For defendant to admit the steps taken by Centex in computing its income tax return would still not be an admission that the values stated by Centex in its return were in fact the value of deductions lost. In our view, defendant's failure to admit the information contained in the requests for admission was thus not the cause of the expense that plaintiffs incurred in proving the value of deductions lost due to Guarini.

Plaintiffs' second basis for fees arises under Rule 37(c)(1). It relates to the late-filed supplemental expert report of Mr. Wolf and the recalibration schedule. There is no question that the supplemental report was out of time. Defendant was to have furnished its expert report to plaintiffs by February 27, 2002. The supplemental report was offered on August 23, 2002.

The purpose of RCFC 26(a)(2), which requires parties to disclose the identity of persons who may be used as expert witnesses, as well as any opinions they may render, is to encourage the timely exchange of expert information. The rule calls for disclosure of "all opinions to be expressed and the basis and reasons therefor." RCFC 26(a)(2). There is a continuing duty to supplement prior responses, if occasion warrants. These obligations are enforceable through RCFC 37(a)(2) and (c)(1).

Plaintiffs attempted to protect themselves in the appropriate manner, namely, by asking the court to strike the expert report. As we explained above, however, in the interest of better understanding the expert's contentions, we denied plaintiffs' motion to strike the report and, instead, permitted plaintiffs a second deposition of Mr. Wolf. Even if the supplemental report had been useful to a full

understanding of the competing presentations, we could have compelled defendant to absorb the costs to plaintiffs of a second deposition. In hindsight, however, the report was anything but useful. It added further confusion to the court's consideration of the cross-motions for summary judgment as to damages. It should never have been submitted. It was, of course, withdrawn by defendant, but only after plaintiffs had redeposed Mr. Wolf.

The recalibration raises additional issues. As with the supplemental expert report, the court denied plaintiffs' motion to strike and permitted the use of the recalibration at trial. Defendant contends that it was not an expert report and, therefore, falls outside the reach of any sanctions under Rule 37, which are driven by discovery obligations related to expert witnesses. The problem with that response is that the recalibration was put together by a team of persons, including Mr. Wolf and other experts outside the reach of the court. Mr. Wolf was asked, as an expert, to endorse it, which he did. Like the supplemental expert report, this document, attached originally to defendant's response and cross-motion for summary judgment, was an untimely summary of expert testimony.

The recalibration prompted plaintiffs to develop their own response document. Both the defendant's document and plaintiffs' response prompted most of the testimony during the hearing. The recalibration was thus a supplemental expert report, and, like the supplemental Wolf report, was submitted far out of time.

Before considering the merits of the motion, we must address a procedural objection offered by defendant. Defendant contends that plaintiffs cannot move for fees under Rule 37 because their previous motions were denied and such denials merged with the final judgment and cannot be revisited by this court after appeal. Presumably, defendant's position is that plaintiffs waived any request for sanctions associated with the Wolf supplemental report or the recalibration document by not making a second Rule 37 motion with respect to each of those documents prior to entry of judgment. As defendant points out, the court denied plaintiffs' motions to strike and their request for sanctions, and plaintiffs did not appeal those denials. Nor did plaintiffs make separate motions under Rule 37 after trial and before entry of judgment.

As the title of Rule 37 makes clear, the rule is concerned with sanctions to address "Failure to Make Disclosures or Cooperate in Discovery." As disclosures and discovery are generally pretrial concerns, defendant argues that any shortcomings in that respect should be called to the court's attention when the primary remedies offered are still meaningful, such as exclusion of evidence. Plaintiffs respond that the precise grounds for the motion did not become clear until defendant withdrew the supplemental report or until the date the court issued its final opinion, which occurred contemporaneously with the entry of judgment.

The parties cite numerous decisions related to the question of the timing of Rule 37 motions. None are directly on point. Most of the decisions plaintiffs cite relate to Rule 11 motions, which we do not view as precedent here. The concerns of that rule are different, and the timing and dynamics of how Rule 11 violations are exposed are also different. Most of defendant's citations refer to waiver of substantive arguments.

The case most closely on point is *Chemical Engineering Corp. v. Essef Industries, Inc.,* 795 F.2d 1565, 1574 (Fed.Cir.1986). The Federal Circuit ruled there that the district court retained jurisdiction after judgment to grant a motion for discovery sanctions under Rule 37(c)(2) and that the entry of a separate judgment to that effect was not beyond the trial court's jurisdiction.[9] There are two

---

9. The Federal Circuit held the following with respect to a challenge to the district court's exercise of jurisdiction over a motion for fees filed shortly after entry of judgment, but during the pendency of the appeal:

No rule specifies the time during which a Rule 37(c) motion must be filed, and, as is explained in the advisory committee note to Rule 37(c), the rule is intended to provide *post-trial* relief. As a practical matter, it will often be necessary to complete a proceeding before it can be said that a requester has "proved" the truth of the matter for which an admission had been requested. We do not believe that the Seventh

points distinguishing that case. The first is that the court was called on to enforce the law of the Seventh Circuit. The second is that the motion was brought under Rule 37(c)(2), unlike the present motion, which we are considering under Rule 37(c)(1). Defendant points out that the former subparagraph is concerned with requests for admission, the importance of which indeed might not be apparent until after trial. Any motion under the latter, on the other hand, according to defendant, should be made contemporaneously with the discovery process.

 Under the circumstances of the present case, however, it was not fully apparent until after the hearing that consideration of the supplemental expert report and the recalibration schedule was both unnecessary and disruptive. There being no absolute prohibition of consideration of sanction motions after entry of judgment, we conclude, under these unique circumstances, that plaintiffs' May 5, 2003 motion for fees was not untimely and that the grounds for requesting sanctions were not waived.

 There is no question that the supplemental report and the recalibration schedule were expert materials that were offered late, in violation of Rule 26(a)(2). Although the court permitted them to be used by defendant, the supplemental report was subsequently withdrawn and the recalibration added nothing but confusion to the hearing. Rule 37(c)(1) permits monetary sanctions in lieu of evidentiary sanctions, such as the exclusion of evidence. The court's decision to permit the supplemental expert report and recalibration was prompted, unjustifiably as it developed, by the desire to permit a full explanation of the parties' positions. We believe that the imposition of monetary sanctions is appropriate in lieu of the evidentiary sanction, which can no longer be imposed.

We are not prepared to rule, however, that in retrospect we were not benefitted by the hearing. Perhaps the court would not have agreed to the hearing, but we decline to treat it as useless. It was helpful to question Mr.

Mason and Mr. Wolf. Under these circumstances, we believe the appropriate sanction is that the government should reimburse plaintiffs for the time spent responding to the supplemental report, including time spent in Mr. Wolf's re-deposition. In addition, we believe it appropriate that defendant should pay half of plaintiffs' fees and costs incurred after oral argument on November 8, 2002, and through December 19, 2002, the date of the hearing, as well as one quarter of plaintiffs' fees and costs associated with these motions.

## CONCLUSION

For the reasons set out above, plaintiffs' motion for attorneys' fees under Rule 54(b) is denied. Defendant's motion to strike is denied as moot. Plaintiffs' motion for sanctions under Rule 37(c)(2) is denied. Plaintiffs' motion for sanctions under Rule 37(c)(1) is granted as set out above. Plaintiffs are directed to file documentation to support their request for fees and expenses on or before June 16, 2006. Defendant may file a response within 17 days of service of plaintiffs' documentation. Plaintiffs may file a reply within 17 days of service of defendant's response.

---

Circuit would hold, nor would we, that a losing party, by filing a notice of appeal the moment judgment is entered, could thereby divest the district court of all discretion to award appro-

priate post-trial relief within weeks thereafter, and well before the appeal is ready to be heard by the court of appeals.
*Chem. Eng'g,* 795 F.2d. at 1574.